```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
                      Plaintiff,      )
 5                                    )
     -vs-                             )  Case No. 12 CR 416
 6                                    )
     CHARLES B. ESTELL,               )  Chicago, Illinois
 7                                    )  March 13, 2014
                      Defendant.      )  10:45 a.m.
 8
                       TRANSCRIPT OF PROCEEDINGS
 9              BEFORE THE HONORABLE GARY FEINERMAN

10   APPEARANCES:

11   For the Government:        HON. ZACHARY T. FARDON
                                UNITED STATES ATTORNEY
12                              BY:  MR. PATRICK J. KING
                                219 South Dearborn Street, Suite 500,
13                              Chicago, Illinois   60604
                                (312)353-5300
14
     For the Defendant:         MR. CHARLES B. ESTELL, Pro Se
15                              #08237-045
                                Metropolitan Correctional Center
16                              71 West Van Buren Street
                                Chicago, Illinois   60605
17
     (Standby Counsel)          MEYER & O'CONNOR, LLC
18                              BY:  MR. JOHN A. MEYER
                                122 South Michigan Avenue, Suite 1070
19                              Chicago, Illinois   60603-6270
                                (312) 346-9000
20
     Also present:              MS. KELLY KWONG, U.S. Probation.
21
     Court Reporter:
22
                         CHARLES R. ZANDI, CSR, RPR, FCRR
23                            Official Court Reporter
                          United States District Court
24               219 South Dearborn Street, Suite 2128
                          Chicago, Illinois   60604
25                     Telephone:   (312) 435-5387
                  email:  Charles_zandi@ilnd.uscourts.gov
```

1     (Proceedings heard in open court:)

2          THE CLERK:  12 CR 416, USA versus Estell.

3          MR. KING:  Good morning, your Honor.  Patrick King

4     appearing on behalf of the United States.  Also present with

5     me is Melissa Goldman, an intern with our office.

6          MR. MEYER:  And John Meyer as standby counsel for

7     Mr. Estell.

8          MR. ESTELL:  Good morning.  Charles Estell.

9          THE COURT:  Okay.  Good morning, everybody.

10    Mr. Meyer, have you had a chance to speak with Mr. Estell

11    about how things might go this morning?

12         MR. MEYER:  I met with Mr. Estell last Friday at the

13    MCC, and I was available to answer any questions that he had

14    concerning these proceedings and sentencing procedures in

15    general.

16         THE COURT:  I see.  And, Mr. Estell, are you going to

17    be conducting this hearing by yourself --

18         MR. ESTELL:  Yes.

19         THE COURT:  -- or are you going to ask Mr. Meyer to

20    step in?

21         MR. ESTELL:  No, I'm going to be conducting it by

22    myself.

23         THE COURT:  Okay.  If at any point you have a

24    question and you'd like to consult with Mr. Meyer, you should

25    feel free to do so.

1        MR. ESTELL:  Thank you, sir.

2        THE COURT:  And, Mr. Meyer, is that your

3   understanding of how things are going to go?

4        MR. MEYER:  That is correct, Judge.

5        THE COURT:  All right.  Mr. Estell, have you had a

6   chance to see the presentence investigation report?

7        MR. ESTELL:  Yes, I have.

8        THE COURT:  And you addressed the report in your

9   sentencing memorandum.  Other than the objections and

10  corrections that you've set forth in your sentencing

11  memorandum, do you have any others that you'd like to present?

12       MR. ESTELL:  Yes, I have a few other objections that

13  I would like to state for the Court.

14       THE COURT:  Okay.  And I'm going to give you -- so,

15  I'll note that you are going to have some objections, and I'll

16  let you address those when you make your sentencing

17  presentation.

18       And you object as well to the Advisory Guidelines

19  range that is set forth in the PSR, is that correct?

20       MR. ESTELL:  Yes.

21       THE COURT:  And when I say PSR, I mean the

22  presentence investigation report.

23       MR. ESTELL:  Yes, the report.

24       THE COURT:  And have you had a chance to speak with

25  Mr. Meyer about the PSR?

1          MR. ESTELL:  We spoke briefly about it, yes.

2          THE COURT:  Okay.  Mr. King, any objections or

3     corrections to the PSR?

4          MR. KING:  No, we do not, your Honor.

5          THE COURT:  By the way, if anybody who is not

6     addressing the Court would like to have a seat at any time,

7     you may do so.  If you'd prefer to remain standing, you can do

8     that as well, whatever you're most comfortable doing.

9          So, we're going to do is we're first going to figure

10    out what the Advisory Guidelines range is, and I'll hear

11    argument on that.  And then once I make that determination,

12    we'll consider the 3553(a) factors.

13         And I think that the advisory -- in terms of

14    determining the Advisory Guidelines range, I'd like to hear

15    from Mr. Estell, and then I'll hear from Mr. King.  Do we have

16    somebody from Probation here?

17         MR. KING:  Yes, your Honor.  For the record --

18         MS. KWONG:  Yes, your Honor.  Kelly Kwong on behalf

19    of the Probation Office.

20         THE COURT:  Okay.  I'm sorry.

21         MS. KWONG:  That's okay.

22         THE COURT:  And then I'll ask Probation if Probation

23    has anything to say, and then I'll bring it back to

24    Mr. Estell; and then I'll make the determination of the

25    Advisory Guidelines range.

1        Does either side have anybody else to present as a

2    witness with respect only to the Advisory Guidelines range?

3        MR. ESTELL:  No, your Honor.

4        MR. KING:  No, your Honor.

5        THE COURT:  Okay.  When we get to the 3553(a)

6    factors, we'll do the same thing; Mr. Estell, Mr. King,

7    Probation, and then Mr. Estell.  Does either side have

8    anybody -- does either side have anybody to present at the

9    3553(a) stage?  Mr. King?

10        MR. KING:  Your Honor, Marypat --

11        THE COURT:  Heisterman?

12        MR. KING:  -- Heisterman, thank you, is a victim in

13    this case, and she would like to address the Court.

14        THE COURT:  Okay.  Go ahead.  Anybody else?

15        MR. KING:  That would be done under the Victim

16    Witness Act.  That is it, your Honor, in terms of witnesses.

17        THE COURT:  Okay.  Mr. Estell?

18        MR. MEYER:  Yes.  As far as the mitigating factors,

19    yes, I would have my fiancee present a statement, if that's

20    possible, if that pleases the Court.

21        THE COURT:  Sure.

22        MR. ESTELL:  And that's it, sir.

23        THE COURT:  And that's Miss Randle?

24        MR. ESTELL:  Yes, Miss Randle.

25        THE COURT:  All right.  That would be fine.

1          Does anybody have a different idea of how things

2  ought to proceed this morning, different than the order that

3  I've proposed?

4          MR. KING:  No, your Honor.  I would expect that the

5  witnesses appear before the 3553 arguments, yes.  That's all.

6          THE COURT:  Okay.

7          MR. KING:  No, your Honor.

8          THE COURT:  Okay.  So, let's first talk about the

9  Advisory Guidelines range.  And if I'm -- read the PSR

10  correctly, and I think I did, the PSR concluded that

11  Mr. Estell is a career offender and, therefore, has a -- an

12  offense level of 34 and a criminal history category of VI.

13          And Mr. Estell has challenged his designation, at

14  least by Probation, as a career offender.  And I think

15  Mr. Estell also -- you think you ought to get an acceptance

16  of responsibility under 3E1.1.  You've also challenged the

17  obstruction enhancement and the loss amount, although those --

18  those matters would be moot if you are a career offender, but

19  you should make argument on that if you'd like.

20          And other than those four things, do you have any

21  other corrections to the Advisory Guidelines calculation that

22  has been proposed by the Probation Office?

23          MR. ESTELL:  Yes, your Honor.  There were -- there

24  were a couple of double-counting that I would like to address

25  the Court about at the appropriate time, so --

1      THE COURT:  Okay.  Before we go forward, let me -- I

2   actually saw a dissonance between the government's calculation

3   of the Advisory Guidelines range and Probation.  The

4   government, in its sentencing memorandum, said that the

5   Guidelines range on Count 1 is 262 to 327, which of course it

6   becomes 262 to 300 months because of the statutory maximum.

7   And then it says on Count 2, there's a seven-year mandatory

8   minimum and a maximum of life.  The Guidelines range is

9   properly calculated, but the government doesn't say what the

10  Guidelines range is.

11      How I understood the PSR is that Probation was saying

12  that the Advisory Guidelines range is 360 months to life, and

13  that is based on 4B1.1(c).

14      So, let me ask Probation, did I get that correctly?

15  Did I get that correct?

16      MS. KWONG:  The PSR is correct.  It's 360 months to

17  life because of that seven-year mandatory consecutive.  It

18  gets added on to the offense level from Count 1.  It's a

19  little confusing.

20      THE COURT:  Yes.  I don't -- I get to the same -- at

21  least I understand that you got to that place, but the

22  explanation you just gave me makes no sense at all.

23      MS. KWONG:  Okay.  Let me try.  The Guidelines --

24      THE COURT:  Let me take out -- do you have

25  4B1.1(c)(3)?  In other words, it has nothing to do with the

1  seven-year consecutive.  It has nothing to do with the fact

2  that the consecutive would be seven years to life.

3          My understanding is that 4B1.1(c) says -- and by the

4  way, Mr. Estell, we're going to get to you in a moment.  I

5  just want to figure out what their position is --

6          MR. ESTELL:  I understand.

7          THE COURT:  -- and then give you something to argue

8  against.

9          If the defendant is convicted of Section 924(c),

10  which is what we have here, correct?

11          MR. KING:  Yes, your Honor.

12          THE COURT:  And the defendant is determined to be a

13  career offender under subsection (a), which is something that

14  we're going to discuss in a moment, but let's just assume

15  right now hypothetically that Mr. Estell is a career offender,

16  the applicable Guideline range will be determined as follows:

17          Subsection (1) doesn't apply, because the only count

18  of conviction is not 924(c); so therefore, subsection (c)(2)

19  applies, because there are multiple counts of conviction.  And

20  the Guidelines range shall be greater of either A or B.  And

21  let's just go with B.  It says the Guideline range determined

22  using subsection (c)(3).  And subsection (c)(3) says if

23  there's no 3E1.1 reduction for acceptance of responsibility,

24  which is another matter that I'm going to hear Mr. Estell

25  about, that the Guidelines range is 360 to life.

1            MS. KWONG: Yes.

2            THE COURT: Is that how you got to where you are?

3            MS. KWONG: Yes.

4            THE COURT: Okay. So, the fact that the consecutive

5 is seven to life has nothing to do with anything?

6            MS. KWONG: No, there was a middle step in there that

7 I neglected to kick out, but it's explained in the PSR. So,

8 the ultimate 360 to life is coming from 4B1.1(c)(3).

9            THE COURT: Okay. Mr. King, do you agree with that?

10            MR. KING: I do.

11            THE COURT: Okay. Now, is the Guidelines range

12 360 months to life, is that on Count 1, on Count 2, or on

13 both? And again, I'm not -- I'm just asking for your

14 position. In other words, is it 262 to 300 on Count 1 and

15 360 to life on Count 2, or is it 360 to life combined for

16 Counts 1 and 2?

17            MS. KWONG: I believe it's 360 to life combined for

18 Counts 1 and 2.

19            MR. KING: I think your -- the first option is

20 correct, because we have to separate them out.

21            THE COURT: Again, what do you mean by first option?

22 Because my first option was it's combined.

23            MR. KING: It's 262 to 300 for Count 1.

24            THE COURT: Yes.

25            MR. KING: And 360 to life on Count 2.

1       THE COURT:  Okay.  So, you disagree with Probation on
2   that?
3       MR. KING:  No, I agree with them.  They've just
4   combined it.
5       THE COURT:  No, you disagree, because if it was done
6   your way, then the bottom end of the range would be 262 plus
7   360, and the top end of the range would be life, because
8   they're consecutive.
9       MR. KING:  Yes.  I guess my -- for all -- for all
10   intents and purposes, the 300 limit is only because of the
11   25 maximum statutory penalty on Count 1.  So, the effect of
12   the Guidelines -- your Honor, I'm not trying to make this
13   confusing.  I'm just suggesting that --
14       THE COURT:  Well, you're not succeeding in not making
15   it confusing.
16       MR. KING:  Thank you.  But on Count 1, were the Court
17   to impose a sentence of 360 months on Count 1, that would not
18   be proper, even though the Guidelines calculation is --
19       THE COURT:  Right, but I allocate under 5G1.2(e).
20       MR. KING:  Given that, that is correct, your Honor.
21       THE COURT:  So, it's your position -- and again, I
22   don't know whether your position is right yet.  I haven't made
23   that determination.  But your position is that the combined
24   Guidelines range for the two counts is 360 to life; and then I
25   have to allocate that under 5G1.2(e), and in allocating it, I

1  cannot give a sentence of higher than 25 years on Count 1?

2          MR. KING:  That's correct.

3          MS. KWONG:  That's correct, Judge.

4          THE COURT:  So, now we know what the government's

5  position is, and it is in line with the Probation Office's

6  position.

7          There are two key premises of that position that

8  Mr. Estell is challenging.  The first is whether he's a career

9  offender, and the section is whether he's entitled to a 3E1.1

10 reduction for acceptance of responsibility.

11         And I think you have some other challenges as well,

12 so why don't I turn it over to you, Mr. Estell.

13         MR. ESTELL:  Thank you.  First, thank you for

14 allowing me to address the Court, sir.

15         I -- considering the career offender status, and I'm

16 going off of just some things that happened at trial also and

17 also during the sentencing phase based on my criminal history.

18         My base offense level for armed bank robbery,

19 Count 1, is 20.  And first let me say, your Honor, should I

20 address the double-counting first or just the actual other

21 Guidelines?

22         THE COURT:  It's up to you.  However you want to --

23 you're representing yourself.  You can make whatever argument

24 you'd like to make.

25         What would be helpful, I think, most helpful to you

1    would be if you addressed the career offender issue --

2            MR. MEYER:  Okay.

3            THE COURT:  -- which is 4B1.1(a) says that a

4    defendant is a career offender if:  1. Defendant was at least

5    18 years old at the time the defendant committed the instant

6    offense of conviction, which applies here; 2. The instant

7    offense of conviction is a felony that is either a crime of

8    violence or a controlled substance offense, which is the case

9    here; and, 3, which is where you're going to want to devote

10   your attention, the defendant has at least two prior felony

11   convictions of either a crime of violence or a controlled

12   substance offense.

13           But again, that's what I'm looking at, but you can

14   make whatever argument you want.

15           MR. ESTELL:  No, that's fine, your Honor.  I just

16   wanted to make sure that I wanted to address it how you

17   thought would be best.

18           THE COURT:  But I'm not -- just so we're clear, I'm

19   not telling you what you should argue or what you shouldn't

20   argue.  That is completely up to you.

21           MR. ESTELL:  Okay.

22           THE COURT:  I've just told you what's on my mind, and

23   whether you address that or not and how you address it is

24   completely up to you.  I'm not directing you in any way,

25   shape, or form as to what you may or may not argue here this

13

1    morning.

2          MR. ESTELL:  Okay.  Well, in light of that, thank

3    you, sir.  What I'm going to do is I'm going to address the

4    career offender status first.

5          THE COURT:  Okay.

6          MR. ESTELL:  First, the PSR, excuse me, came back

7    with a level of 34.  And how they arrived at the Level 34 was

8    the enhancements obviously from the career offender.  And how

9    they got to the career offender status was because of a 1994

10   conviction, docket No. 940 -- 94-03069-04 CR S4.  And this was

11   the '94 conviction.

12         THE COURT:  And that's the one -- just so we're all

13   following along, that's the one at paragraph 55 of the PSR,

14   correct?

15         MR. ESTELL:  Yes -- no, I'm sorry.  It's in

16   paragraph 44, page 11.

17         MR. KING:  I believe he's referring to page --

18   paragraph 42 of page 11.

19         THE COURT:  Yes.

20         MR. KING:  But it's also listed --

21         THE COURT:  Yes.  You're right, Mr. Estell, it's

22   paragraph 42 of page 11, which indicates that -- at least

23   Probation's view that you're a career offender, and you're

24   referring to the District Court for the Western District of

25   Missouri conviction.

1    MR. ESTELL:  Yes.

2    THE COURT:  And the details of that are on

3    paragraph 55 on page 14.

4    MR. ESTELL:  Okay.

5    THE COURT:  Go ahead.

6    MR. ESTELL:  So, yes, your Honor, they came to this

7    conclusion based off of the '94 conviction and the San Diego

8    conviction, again, we're still on page 11, the San Diego

9    conviction, circuit number -- docket No. SDC 216721.

10    Again now, this boosts me to a Level 34 because of

11    these two enhancements.  Now, from our pretrial motions that

12    we had before we went to trial, the government argued in their

13    motion *in limine* that they were trying to use this '94

14    conviction.  However, you decided against it because you said

15    it was too old -- the case was too old.  You did not allow

16    them to bring it to the forefront for the jury to hear that.

17    You stopped them from arguing that because you said the case

18    was too old.

19    The case is over 20 years old, your Honor, I mean,

20    actually, to the date 20 years old.  So, I don't think that

21    that case should be used to career me.

22    Secondly, they are using a -- another drug conviction

23    of a superior -- San Diego County, docket number I just

24    explained.  And this, they're saying that -- usually because

25    they're saying that it was a possession with intent to

1    deliver, and under this range, of course, it applies to a

2    career offender status.

3            However, I have documentation that shows that this

4    was a misdemeanor.  May I show the judge, your Honor?

5            THE COURT:  Sure.  Why don't we show it to Mr. King

6    first.

7            MR. ESTELL:  This is a -- this is the conviction from

8    the actual county jail and actual State of California was --

9    shows that this was a misdemeanor instead of a felony offense.

10           Now, these two cases are --

11           THE COURT:  And just so we're going along, this is --

12   this -- for purposes of appellate review, this is the

13   conviction that the details are set forth in paragraph 59 of

14   the PSR.

15           MR. ESTELL:  You say 59?  Again, I'm looking at 42,

16   but --

17           THE COURT:  I understand.  The details are at 59.

18           MR. ESTELL:  Okay.  Yes.  Yes, you're right, your

19   Honor.  Yes.  Count 1 --

20           THE COURT:  So, you're saying that that's a

21   misdemeanor?

22           MR. ESTELL:  Yes.  Count 1 -- that's exactly what I'm

23   saying, sir.  I was tried on two counts.  Count 1 was dropped,

24   and Count 2 was possession.  They're saying this was three

25   years extended probation, whatever, but that's what it was.

1　It was a misdemeanor, your Honor, and the documentation is
2　right here in front of you.
3　　　　　　　THE COURT:　Okay.
4　　　　　　　MR. ESTELL:　However when the prosecution gets
5　through --
6　　　　　　　THE COURT:　Okay.　I'll take a look at that as soon
7　as Mr. King is done with it, and Probation.
8　　　　　　　MR. ESTELL:　Okay.
9　　　　　　　THE COURT:　If you can hold on one second.　This is
10　an important -- may be an important argument, because we also
11　have the vehicular hijacking at paragraph 58.
12　　　　　　　MR. ESTELL:　Yes.　Well, your Honor, considering, if
13　I can address the Court, considering the vehicular hijacking,
14　there is nothing I can -- nothing I can argue against the
15　hijacking because it was a case that I pled guilty to;
16　however, I would like to address that when we do argue the
17　mitigating factors, because what brought me to that conviction
18　was something that I think needs to be addressed.
19　　　　　　　THE COURT:　Okay.　And I read your position on that
20　in your brief, and you're certainly able and welcome to
21　address that here in court as well.
22　　　　　　　So, basically, on the career offender status, the
23　Probation Office in the PSR indicated that you had three --
24　　　　　　　MR. ESTELL:　Yes.
25　　　　　　　THE COURT:　 -- prior felony convictions of either a

1    crime of violence or a controlled substance offense.

2         MR. ESTELL:  Yes.

3         THE COURT:  You're challenging two of them.

4         MR. ESTELL:  Yes.

5         THE COURT:  The Western District of Missouri cocaine

6    base conviction, which is at paragraph 55, and the marijuana

7    possession conviction, which is at paragraph 59.

8         MR. ESTELL:  Yes.

9         THE COURT:  And if you're right on both of those,

10   then you'll have only one prior and, therefore, you're not a

11   career offender.

12        MR. ESTELL:  Yes.

13        THE COURT:  And then we have to recalculate

14   everything, which is fine.

15        So, what do you guys -- the prosecutor and the

16   probation officer, you're looking at the document?

17        MR. KING:  We've seen what he's tendered to us, your

18   Honor, which is a one-page piece of a rap sheet.  The problem

19   with obviously not complying with the local rules and

20   providing it to us in advance is it makes it difficult to

21   check out.

22        The documents that the Probation Department has

23   indicates that it was a felony probation, so it will take just

24   a few more minutes.  I can tender this to the Court.

25        MR. ESTELL:  Your Honor, in light of what he's

1    saying, the prosecution's saying that it wasn't tendered.

2    Your Honor, that's part of my discovery.  This is what was

3    given to me by the prosecutor, so you cannot argue that you

4    did not know anything about that.

5              MR. KING:  To make it perfectly clear, defendant

6    received a number of items in discovery, including copies

7    of --

8              THE COURT:  I don't care about this.

9              MR. KING:  -- his rap sheet.  He has to --

10             THE COURT:  I don't care.  Just tell me what your

11   position is on that.  I don't care about the discovery.

12             MR. KING:  My position is I do not know because this

13   rap sheet seems -- appears to be at odds with the documents

14   received from the government in California, which represents

15   that it's a felony.  And based upon this sheet alone, until we

16   resolve the conflict, we may have to make an inquiry.

17             THE COURT:  That's fine.

18             MR. KING:  I can tender it to the Court.

19             Your Honor, would the Court wish to look at the

20   records of the Superior Court of California, which the

21   Probation Department has?

22             THE COURT:  Absolutely.  All I -- and let's make sure

23   we show it to Mr. Estell first.

24             And again, I don't -- all I care about is getting it

25   right on the substance.  I don't care who gave what to who.

1  I'm not interested in that.  I just want to know what the

2  right answer is.

3            So, the sheet that Mr. Estell gave me, which is

4  Bates stamped 402 in 12 CR 416, seems to indicate that the

5  conviction in San Diego was for a misdemeanor, possession of

6  marijuana for sale.

7            The document that the prosecutor and the probation

8  officer gave, which is also from the Superior Court, tell me

9  where on here indicates to you that it was a felony.

10           MR. KING:  I believe under the boldened line about

11  the last third of the page, it indicates felony probation.

12           THE COURT:  Yeah.  This is a felony probation to the

13  court without the supervision of a probation officer?

14           MR. KING:  Yes, your Honor.

15           THE COURT:  What does that mean?

16           MS. KWONG:  There should be another line probably

17  near where your thumb is that says it's a felony conviction or

18  felony offense.

19           THE COURT:  It says, "The defendant's felony

20  conviction to be reported to the registrar of voters."

21           All right.  So, this has happened once before where

22  the state court seems confused about the nature of the

23  conviction.  Do we know what the statute was that Mr. Estell

24  was convicted of committing?  And that's Count 2 in this

25  San Diego prosecution.

1          MS. KWONG:  Felony complaint, I believe, is on the

2     first page, your Honor.

3          THE COURT:  Okay.  And we know there was a felony --

4     we know that Count 1 was a felony, right, Mr. Estell?

5          MR. ESTELL:  Yes.

6          THE COURT:  But you weren't convicted on Count 1.

7          MR. ESTELL:  Yes.

8          THE COURT:  You were only convicted on Count 2,

9     because you pled guilty and the prosecutor dismissed Count 1,

10    correct?

11         MR. ESTELL:  Yes.

12         THE COURT:  Maybe you can help me out.  If you can

13    give me a statutory cite, I'm just going to go to Westlaw, and

14    I'm going to pull it up; and we'll figure out whether it's

15    actually a felony or a misdemeanor.

16         MR. ESTELL:  Your Honor, I don't think they have the

17    statute.  They have something that says it's a Code 11359,

18    but --

19         THE COURT:  Well, there has to be a statute.  We just

20    have to figure out what it is.

21         MR. KING:  Your Honor, it appears that -- the Health

22    and Safety Code 11359, so the question is what's the preamble

23    for the Health and Safety Code.  And neither count bears that

24    on the face of the document.  So --

25         THE COURT:  So, you think it's 11359?

1    MR. KING:  Yes, California Health and Safety Code,
2   Section 11359.

3    THE COURT:  Okay.  I have it right here.  The
4   California Health and Safety Code 11359.  And we're doing this
5   on the fly because Mr. Estell's raising this here now, and so
6   this isn't ordinarily what happens; but Mr. Estell made an
7   argument, and let's just figure it out right now.

8    So, what 11359 says, of the California Health and
9   Safety Code, "Every person who possesses for sale any
10  marijuana except as otherwise provided by law," I think that
11  refers to the medical marijuana provisions of California law,
12  "shall be punished by imprisonment pursuant to Subdivision H
13  of Section 1170 of the Penal Code."

14   It doesn't say whether it's a felony or a
15  misdemeanor, but let's go -- I'm going to click on to 1170,
16  Subsection H, and we'll see what that says.  And if the
17  penalty -- I don't know what it's going to say, but if the
18  imprisonment is over a year, it's probably a strong indication
19  that it's a felony; but if the maximum is less than a year,
20  then it's a misdemeanor.  So, we'll see what it says.

21   So, it would appear that it's a felony because
22  Subsection H(1) of Section 1170 of the California Penal Code
23  says, "Except as provided by paragraph 3, a felony punishable
24  pursuant to this subdivision where the term is not specified
25  in the underlying offense shall be punishable by a term of

1   imprisonment in a county jail for 16 months or two to three
2   years."

3       And then it just -- there are other references to it
4   being a felony provision.

5       I'm not sure -- what I'm going to do is I'm going to
6   ask my law clerk to go back and do some research over the next
7   few minutes.

8       Ryan, that's Section 11359 of the California Health
9   and Safety Code.  And if you could find any cases that address
10  that provision and whether the cases indicate whether it's a
11  felony or a misdemeanor directly or whether -- whether it
12  refers to a term of -- the sentence applicable to that
13  violation.

14      So, rather than do it in realtime, I'll leverage my
15  law clerk's time here, and then we can go on and discuss other
16  things.  So, we'll put to the side for one moment -- and I'll
17  hand this back.  I will say, though, that the document that
18  Mr. Estell handed me seems to indicate that 11359 -- it lists
19  conviction status as a misdemeanor.  So, that may be wrong,
20  but -- Ryan, could you please hand this back to Mr. Meyer.

21      MR. MEYER:  And, Judge, could I suggest that
22  Mr. Estell's exhibit be marked as an exhibit for this hearing,
23  and likewise, the probation officer's records be marked as an
24  exhibit?

25      THE COURT:  Mr. Estell, is that something you'd like

1    to do?

2         MR. ESTELL:  Sure.

3         MR. KING:  Your Honor, I think that's appropriate,

4    and I have -- also what should be marked is the certified copy

5    from the State of California for the -- certified copy of

6    conviction and the order of probation, which appears to

7    indicate that it's three years as well.

8         THE COURT:  Okay.  We'll get -- keep those there, and

9    I'll make sure -- I'll ask Jackie to make copies so Mr. Estell

10   can have a copy of what you have and so you can have a copy of

11   what he has and so I can have a copy of what both of you have.

12        All right.  So, that -- we'll put the marijuana

13   conviction to one side; but in order that -- even if you're

14   right on that, that still doesn't get you out of the woods

15   career-offender-wise, because you'll still need to prevail on

16   the 1995 crack cocaine conviction from the Western District of

17   Missouri.

18        MR. ESTELL:  Yes.

19        THE COURT:  So, would you like to make any argument

20   on that?

21        MR. ESTELL:  Yes, your Honor.  As I said previously,

22   that conviction was a 1995 conviction, and it's almost

23   20 years old.  And if I'm correct, the length that you can go

24   back is 10 to 15 years.

25        However, I understand that the Court can use it as it

1    may, but I'm just going off of actually what the statute says,

2    10 or 15 years.  Am I correct, sir?  Excuse me, but according

3    to when I went to trial, you used the same assumption to tell

4    the prosecution that he could not use that against me because

5    it was so old.

6          So, I don't see why now would be any different,

7    because that conviction being told to the jury would have

8    given them obviously a different look at the defendant as a

9    whole, so not allowing it then would be a contradiction to

10   allowing it now, to me.

11         I was understanding, your Honor, and I was told that,

12   you know, you can only bring up the convictions of the

13   carjacking and the drug offense, and that's what you allowed.

14         THE COURT:  Right.  And I made that ruling under

15   Federal Rule of Evidence 609 --

16         MR. ESTELL:  Yes.

17         THE COURT:  -- because I thought that the evidence

18   would be more unfairly prejudicial to you than probative of

19   anything involving your character for truthfulness.

20         And the reason I did that is because it was an older

21   conviction and because there were other convictions that came

22   in; and it would be piling on, I thought, to bring in the

23   older conviction.

24         But just because something is inadmissible or the

25   Court rules as a discretionary matter that something is

1   inadmissible under Rule 609 doesn't mean that the conviction
2   doesn't count for purposes of calculating the Advisory
3   Guidelines range.

4           And that determination is governed not by Federal
5   Rule of Evidence 609, but by Section 4B1.1 of the advisory --
6   I'm sorry, 4A1.2 of the Guidelines manual.  And what 4A1.2(e)
7   says is, "Any prior sentence of imprisonment exceeding one
8   year and one month that was imposed within 15 years of the
9   defendant's commencement of the instant offense is counted."
10  Your offense -- that doesn't apply to you, because the
11  sentence was imposed in 1995, and you committed the offense --
12  the instant offense in 2012.

13          However, the second sentence of that provision says,
14  "Also count any prior sentence of imprisonment exceeding one
15  year and one month whenever imposed that resulted in the
16  defendant being incarcerated during any part of such 15-year
17  period."  And that does apply to you because you were
18  incarcerated through December of 2003 on that Western District
19  of Missouri conviction, and that was within 15 years of the
20  date of this offense, which was in June of 2012.

21          So, what's your thoughts on that?

22          MR. ESTELL:  Well, your Honor, the grammar is
23  correct.  I mean, I just -- according to what it says here,
24  you are absolutely correct.  I just figured that because --
25  maybe I read it wrong.  Obviously I read it wrong, but I was

1  under the impression that it can go back 10 or 15 years.

2  Obviously, I read it wrong, your Honor.

3          Now what I'm saying is based on the 4A1.2 section (e)

4  applicable time range, then that would satisfy what you're

5  saying.  However, I'm asking the Court, your Honor, I am being

6  possibly careered off of a 19-year-old conviction, and I'd

7  just ask for some kind of understanding behind that.  Also,

8  I'm being careered maybe off of a --

9          THE COURT:  I understand -- I think I understand what

10  you're saying.  I think I understand what you're saying, and

11  I'm going to tell you what I understand that you're saying,

12  and then you tell me if I got you right or if I got you wrong.

13          I think what you're saying is that technically, you

14  qualify as a career offender under the Guidelines due to the

15  vehicular hijacking and the Western District of Missouri

16  conviction; however, given the circumstances of those

17  convictions, you think that I ought to treat you, under

18  3553(a), as if you were not a career offender.  So, you're

19  asking for a variance off the career offender Guideline.

20          In other words, you're saying you technically apply,

21  but you ought -- under 3553(a), where the Court can consider

22  everything and I can put aside the career offender Guideline,

23  you're asking me to do that.  Is that what you're arguing?

24          MR. ESTELL:  On record, your Honor, I don't want to

25  say yes to that, because that would lock me in to an

1  understanding of, you know, I am agreeing that I'm a career

2  offender.

3            THE COURT:  Okay.  So, you're saying, "I'm not a

4  career offender; but, Judge, if you disagree with me like on

5  that, I'd like you to put aside the career offender

6  Guidelines" --

7            MR. ESTELL:  Yes.

8            THE COURT:  -- "as you're allowed to do under

9  3553(a), given the circumstances of the two predicate offenses

10  that we're dealing with here."  One, the vehicular hijacking,

11  which you have an explanation for --

12            MR. ESTELL:  Yes.

13            THE COURT:  -- and two, the Western Missouri drug

14  conviction, which is relatively old?

15            MR. ESTELL:  Yes.

16            THE COURT:  All right.  I understand.  So, anything

17  else on the career offender issue?

18            MR. ESTELL:  No, your Honor.

19            THE COURT:  Okay.  Would you like to address anything

20  else about the Advisory Guidelines range issue?

21            MR. ESTELL:  Well, yes.  While I was counting -- when

22  I was counting, I was counting my calculation as the Guideline

23  range.

24            Okay.  According to the calculations of how they came

25  to the level of 34 minus the enhancements for the career

1  offender, I was -- I'm charged with -- this just makes sense
2  to me as from what I read in the books about double-counting.

3        I'm charged with the defendant robbed the Bank of
4  America in Oak Lawn.  I'm charged with two points for robbing
5  a financial institution, according to what this document says.
6  It says, "The property of the financial institution was taken.
7  Accordingly, two levels are added."  So, we push my base
8  offense level from 20 to 22 because of that.

9        Then special offense characteristics, during the
10  robbery, two people were restrained.  That, I understand.  I'm
11  not arguing that.

12        Special offense characteristics, the defendant robbed
13  the bank, and due to the loss was more than 50,000 but less
14  than 250,000, they're adding two more points for that.

15        There lies the problem, sir.  They're giving me --
16  they're counting me twice for the same thing.  One, they're
17  saying I robbed a financial institution.  Money was taken,
18  gave me two points for that.  Then again at the bottom,
19  they're saying, "We're taking two more points because money
20  was taken, an amount of money was taken."  And as you and I
21  both know, there was no loss to the bank.

22        So, I'm being double-counted for both of those.  Even
23  though I understand what the statute says, if there was money
24  taken from a bank institution, this is how they usually do it.
25  But it doesn't negate the fact that it's still

1    double-counting.

2            THE COURT:  Understood.  So, you're saying that

3    paragraphs 34 and 37, both of which give you a two-point

4    enhancement, are double-counting?

5            MR. ESTELL:  Yes.

6            THE COURT:  Okay.

7            MR. ESTELL:  Then I'm being charged two points for

8    obstruction of justice.  Now, just because -- my argument to

9    that, your Honor, just because the prosecution didn't agree

10   with my defense and I testified in my favor about my defense

11   doesn't mean that it wasn't true.  It just means I was

12   convicted.  And me telling my side of the defense should not

13   be counted as an obstruction of justice, because what I said

14   is what happened.

15           Now, as I say again, I understand that the

16   prosecution does not have to go along with my defense, but

17   obstruction of justice is -- from my understanding is you're

18   trying to impede on justice being served, and you're trying to

19   fabricate a story or -- excuse me, fabricate a story or try to

20   persuade to get from under a charge.

21           I didn't try to do neither of those.  I just gave the

22   jury my defense, and I gave it to the judge; and I presented

23   it to you, and the prosecution didn't believe it.

24           So, obstruction of justice, I don't see how I can get

25   two points from that, even though I know they say from what

1  I'm hearing, I'm sorry, that if you go to trial and you
2  testify in your own defense, you get obstruction of justice.
3  So, if I would have just had went to trial and not testified
4  in my defense, I would not have gotten obstruction of justice?
5  It's the same thing. I'm still saying, regardless of whether
6  I got on the stand or not, that I wasn't part of this crime
7  purposefully.

8         So, the fact that I got on the stand and the fact
9  that I sat -- if I would have sat on my bench and not got on
10 the stand, it's decided where I've obstructed, the same rules
11 should apply, and they don't.

12        THE COURT: All right. Anything else regarding the
13 Advisory Guidelines range?

14        MR. ESTELL: Yes. Well, your Honor, based on those
15 calculations, my -- if it pleases the Court, my calculation
16 came to a Level 24. Now, I understand because of the career
17 offender status it pushes me all the way to a Level 34, your
18 Honor. That's a 10-point enhancement. That's a 10-point
19 enhancement for a '95 conviction, and it was a 10-point
20 enhancement for a marijuana conviction.

21        And I think it's just too heinous for what those
22 charges were. I'm possibly -- I'm possibly going to be
23 careered for a 28.5-gram marijuana conviction. However, I
24 understand it's at your discretion, and even if you give me
25 the career offender, I understand that.

1    But my calculations when I calculated, your Honor,
2  was a Level 24, which is -- the Guideline range for that is
3  77 to 96 months.  That's giving -- you deduct two points for
4  money being taken from a financial institution and the two
5  points for how much money was taken.

6    So, it would be 20 points -- one more quick thing,
7  sir, before I forget.

8    Count 1 is armed bank robbery.  This is another point
9  of double-counting.  Count 1 is armed bank robbery, sir.
10  Armed bank robbery, we know, is 0 to 25.  Regular bank robbery
11  is 0 to 20.  I am being charged with armed bank robbery, which
12  means I had a weapon.  Therefore, I'm automatically getting
13  five years for that, or an extra -- 20 -- yes, 0 to 25.  I'm
14  getting five years for that automatically, because it's
15  categorized as armed bank robbery.

16    Now, on top of that, Count 2, I'm being charged with
17  the same weapon again twice.  The language should have been
18  bank robbery, which is 0 to 20.  You charged me for armed bank
19  robbery, and you charged me -- you charged me for armed bank
20  robbery in Count 1 for using a gun or weapon, and then you
21  charged me in Count 2 for using a gun again.  This is
22  double-counting.

23    Based on those issues, sir, as I said, it would push
24  me at a Level 24, and my calculations, obviously, a Level 24,
25  category IV, based on the convictions that I have, would be

1    77 to 96 months.

2            THE COURT:  Okay.  All right.  Thank you.

3            Any response on the -- just on the Advisory

4    Guidelines issue from Mr. King?

5            And I know, Mr. Estell, you made a -- you weren't --

6    you didn't simply argue Advisory Guidelines; you also argued

7    that the career offender status, if it did apply to you,

8    really overrepresents your actual criminal history.  And I get

9    that.  It's a 3553(a) argument.  You can make it again when we

10   talk about 3553(a).  If you don't, I will consider what you've

11   already said as having made that 3553(a) argument.

12           Mr. King?

13           MR. KING:  Your Honor, there is no double-counting

14   between the bank robbery and the weapon.  If there -- the

15   charge is the charge.  The particular gun offense is charged

16   separately.  The Guideline wasn't enhanced for the bank

17   robbery charge, or else the Guideline range would have been

18   five points higher.

19           With respect to the loss, he took $225,000 out of the

20   bank, across the roof, and concealed it.  The fact that it's

21   ultimately recovered does not inure to his benefit, just as

22   the fact that he was apprehended doesn't inure to his benefit.

23           As to the obstruction of justice, the defendant

24   falsely told the FBI a number of things, falsely implicated

25   other individuals, including people who worked at the bank.

1  He told the FBI that it was a toy.  He testified falsely in
2  court that it was a toy.

3          He testified falsely as to the abduction and coercion
4  story.  The Court heard it.  It is in direct contradiction to
5  the physical evidence, including the calls that he made during
6  the period of time that he claims to have been abducted, not
7  the least of which was he was baby-sitting and letting the
8  mother of the child know that he had the baby.  It wasn't at
9  her mother's house.

10         So, his false testimony in court would be alone a
11 basis, but it goes beyond that.  In addition to that, he's --
12 the alleged post-crime threats, the obstruction enhancement is
13 further supported by that.  Where a witness gives false
14 testimony about a material matter, this Court can and should
15 find that it's simply unreasonable and that that would be a
16 basis to make that enhancement.

17         If you look even in his presentence report at
18 page 10 -- I'm sorry, at page 25, between paragraphs 105 and
19 108, the Court could easily find that he made false statements
20 to the Probation Department.  In 106, he's telling the
21 Probation Department he stopped using marijuana at the age of
22 17, had never been referred to any or undergone any abuse
23 treatment.  Yet in paragraph 108, as the probation officer
24 from the federal court in Missouri and the Illinois Department
25 of Corrections records shows, the defendant made completely

1    contrary admissions.

2           False statements to the Probation Department, false

3    statements to the Court, false statements in the course of the

4    investigation.  But the worst and the most heinous are perhaps

5    the ones during trial.  Based upon that, I think the

6    obstruction enhancement is more than amply justified.

7           THE COURT:  Okay.  Anything from Probation -- or

8    anything more from you, Mr. King?

9           MR. KING:  I'm sorry, your Honor?

10          THE COURT:  Anything more from you?

11          MR. KING:  No, your Honor.

12          THE COURT:  Okay.

13          MS. KWONG:  Nothing, your Honor.

14          THE COURT:  Okay.  Mr. Estell, anything in reply?

15          MR. ESTELL:  Yes, absolutely, absolutely, your Honor.

16          Well, first, the prosecution seems to think that

17   because I responded to a coercion defense and gave my side of

18   the story that -- you know, that that was a lie.  You -- first

19   let me go here before I do anything.

20          Your Honor, on my PSR, 108, obviously, the

21   presentencing reporter got it wrong because when I was

22   arrested, I had no drugs in my system.  When I was on

23   probation or parole, I never had drugs in my system.  Your

24   Honor, I have not used drugs since my first conviction.

25          When I was arrested on this federal case, they gave

1   me a drug test immediately.  There were no drugs in my system.
2   So, obviously, the reporter got it wrong, because I would not
3   have told the reporter that I haven't used drugs since 1993
4   and then two seconds later tell the reporter, yes, I did use
5   drugs a couple of years ago twice a week.  That doesn't make
6   any sense.

7          So, in light of that, there is no way I would have
8   told the reporter that, which he's used in his defense for the
9   obstruction of justice.  I never obstructed by telling this
10  reporter this.  I don't use drugs, period.  I just don't.  You
11  can't make that up.

12         While I was on parole, they give random drug tests.
13  No records -- you have no records of me being on drugs ever.
14  So, why would I tell the reporter now that I have been using
15  drugs twice a week?  It just doesn't make sense.

16         So, this Court is not just a court of law.  It's a
17  court of common sense.  I'm just not going to put that in the
18  presentence investigation knowing that you have to see this
19  and knowing that it would be contradictory.

20         So, in light of that, no, that cannot be used for
21  obstruction of justice.

22         And also, he's making the claim of what happened at
23  trial.  I would like to address those during my mitigating
24  factors.

25             THE COURT:  Okay.

1          MR. ESTELL:  If that please the Court.

2          THE COURT:  All right.  And that's when we -- after

3    we're done with the Advisory Guidelines range and --

4          MR. ESTELL:  Yes.

5          THE COURT:  All right.  Anything else on the Advisory

6    Guidelines range?

7          MR. KING:  No, your Honor.

8          THE COURT:  Okay.  I've considered all of the

9    arguments that have been made, and kind of the big issue

10   here -- or the big issue here is whether Mr. Estell is -- was

11   correctly characterized as a career offender by the PSR.  And

12   the Court finds that that designation was correct.

13         The career offender Guideline is 4B1.1, and as I

14   mentioned, it says that a defendant is a career offender if

15   three predicates are established.

16         The first is that the defendant was at least 18 years

17   old at the time that the defendant committed the instant

18   offense.  That's true.  Mr. Estell here is now, I think, 39,

19   which would have made him either 37 or 38 in June of 2012 when

20   the instant offense was committed.

21         Two, the instant offense of conviction is a felony

22   that is either a crime of violence or a controlled substance

23   offense.  Armed bank robbery is a crime of violence.  I

24   believe the 924(c) is a crime of violence as well, possession

25   of a firearm during the commission of -- in relation to a

1    crime of violence, but that's neither here nor there.   Armed
2    bank robbery is a crime of violence.

3            And third, the defendant has at least two prior
4    felony convictions of either a crime of violence or a
5    controlled substance offense.   The PSR counts three prior
6    convictions, and those are at paragraphs 55, 58, and 59 of the
7    PSR.   And all three of those are prior felony convictions that
8    count under 4B1.1(a)(3).

9            The first one, conspiracy to distribute cocaine base,
10   Western District of Missouri, that's paragraph 55.   That's
11   certainly a controlled substance offense.   Mr. Estell says it
12   shouldn't count, one, because it was excluded from evidence
13   during the jury trial, and two, because it's too old.

14           I've already discussed this, but I'll put it on the
15   record again.   The fact that it was excluded from evidence at
16   trial under 609, in fact, as it incorporates Rule 403 of the
17   Federal Rules of Evidence, does not preclude its use at
18   sentencing.   For sentencing purposes, whether the conviction
19   counts is determined by 4A1.2(e); and a conviction counts if
20   the defendant was incarcerated during any part of the prior
21   15-year period, and he was.   He was incarcerated on the
22   Missouri offense through December of 2003.   So that one
23   counts.

24           The second conviction, paragraph 58, vehicular
25   hijacking, that counts as a crime of violence, and the

1    conviction occurred in 2010.  It was based on a 2007
2    occurrence.

3            And third, paragraph 59 is that possession of
4    marijuana for sale in the Superior Court of California.  I
5    will grant Mr. Estell that the document that he tendered to
6    the Court, which I believe will be marked as Exhibit 1, does
7    say -- it does indicate that the conviction was for a
8    misdemeanor.  The prosecution submitted documents saying that
9    it was a felony.  The document that Mr. Estell gave me,
10   granted, it does say it was a misdemeanor.  That's a mistake.
11   And the courts out on the West Coast have consistently held
12   that Section 11359 is a felony.  And I'll give the following
13   citations.

14            *Lopez-Vasquez versus Holder*, 706 F.3d 1072 at 1075,
15   Ninth Circuit, 2013, where the Ninth Circuit held
16   Section 11359 criminalizes the possession of marijuana for
17   sale.  Because Section 11359 prescribes an imprisonment in
18   the state prison as the only available punishment, it is a
19   felony.

20            In addition -- and this is all stuff that my law
21   clerk, Ryan, has sent me -- a number of the California --
22   there are a number of California Appellate Court cases
23   referring to 11359 as a felony.  *People versus Werner*, 207
24   California Appellate 4th, 1195 at 1200, 2012; *In Re:*
25   *Joshua S.*, 192 California Appellate 4th 670 at 674, 2011;

1 *People versus Brewer*, 2014 Westlaw 795105, February 28th,

2 2014; and, *People versus Adams*, 2014 Westlaw 801512,

3 February 28th, 2014.

4 So, according to the California courts and according

5 to the Court of Appeals with jurisdiction over California,

6 that crime, which was -- Mr. Estell was convicted of that

7 crime in Count 2 of the San Diego offense, is a felony. And

8 it involved a controlled substance.

9 So, 59, that felony in paragraph 59 counts as well as

10 a predicate offense. In the end, it wouldn't have mattered,

11 because we already had two, and two is all you need to qualify

12 as a career offender; but, in fact, we have three.

13 The -- Mr. Estell also -- so, because we have --

14 Mr. Estell is a career offender, the technical Advisory

15 Guidelines calculation is a base offense level of 34 and a

16 criminal history category of VI.

17 MR. MEYER: And, Judge, could I interrupt? To make

18 the record clear, the probation officer's records on the

19 California conviction, that would be Government's Exhibit 1?

20 MR. KING: And 2.

21 MR. MEYER: 1 and 2?

22 MR. KING: Yes.

23 THE COURT: Okay. So, we'll just make -- I was going

24 to make it Sentencing Exhibit 1, 2, and 3, but if you want to

25 make it Defendant's Exhibit 1 and Government Exhibit 1 and 2,

1  it doesn't matter to me.

2          MR. KING:  It doesn't matter to me, your Honor.

3          THE COURT:  Okay.  Whatever you guys end up doing,

4  it's fine with me.

5          And as we discussed or as I discussed with the

6  probation officer and the government, because we have a

7  924(c) conviction, under 4B1.1(c), the Advisory Guidelines

8  range is -- well, it depends.  If there's no acceptance of

9  responsibility reduction under 3E1.1, it's 360 months to life;

10  if there's a two-level reduction, it's 292 months to

11  365 months; and if there's a three-level reduction, it's

12  262 months to 327 months.

13          So, let's get to that point.

14          And I believe, Mr. Estell, in your brief, you did

15  argue that you accepted responsibility under 3E1.1?

16          MR. ESTELL:  Yes, your Honor.

17          THE COURT:  Okay.  I've reviewed Mr. Estell's brief,

18  and I've considered the government's response.  And I've

19  reviewed the Guideline and the application notes, and the

20  Court determines that Mr. Estell is not entitled to an

21  acceptance of responsibility reduction.

22          I'm going to look at the -- I'm going to refer to the

23  application notes.  Application note 2 says that, "The

24  adjustment is not intended to apply to a defendant who puts

25  the government to its burden of proof at trial by denying the

1  essential factual elements of guilt, is convicted, and only
2  then admits guilt and expresses remorse.

3      "Conviction by trial, however, does not automatically
4  preclude a defendant from consideration for such a reduction.
5  In rare situations, the defendant may clearly demonstrate an
6  acceptance of responsibility for his criminal conduct even
7  though he exercises his constitutional right to a trial.

8      "This may occur, for example, where a defendant goes
9  to trial to assert and preserve issues that do not relate to
10  factual guilt, for example, to make a constitutional challenge
11  to a statute or a challenge to the applicability of a statute
12  to his conduct.

13      "In each such instance, however, determination that a
14  defendant has accepted responsibility will be based primarily
15  upon pretrial statements and conduct."

16      Here, Mr. Estell did put the government to its burden
17  of proof at trial, and he did contest his factual guilt.  He
18  said that his crime was the product of coercion and duress.
19  The jury didn't believe it, and nor does the Court.

20      As I'll discuss at length in addressing the 3553(a)
21  factors, the Court believes that the tale that Mr. Estell told
22  at trial was completely fabricated and, therefore,
23  disqualifies him for acceptance of responsibility.

24      There are other factors that the Court has to
25  consider under 3E1.1, and those are set forth in application

1   note 1.  "A.  Whether the defendant truthfully admitted the

2   conduct comprising the offense of conviction."  And here,

3   Mr. Estell did admit that it was him who committed the bank

4   robbery, but he made this duress and coercion defense that was

5   completely fabricated.

6           "B.  Voluntary termination or withdrawal from

7   criminal conduct or associations," that did not occur here.

8   Mr. Estell stopped only when he was caught hiding in the

9   ducts.

10          "C.  Voluntary payment of restitution," there was no

11  restitution here, so I'm not going to count that either

12  against Mr. Estell or in his favor.

13          "D.  Voluntary surrender to authorities promptly

14  after commission of the offense."  There was a surrender.  It

15  was not promptly after the commission of the offense.

16  Mr. Estell remained on the roof, causing a standoff with the

17  law enforcement authorities for several hours after the

18  offense.

19          "E.  Voluntary assistance to authorities in the

20  recovery of the fruits and instrumentalities of the offense."

21  That didn't happen here.  To the contrary, Mr. Estell led --

22  told three different stories to the authorities, and I'll get

23  into this later.  And what he told the authorities can't

24  possibly be considered voluntary assistance.

25          And the other factors don't apply one way or the

1   other, either.  So -- and I believe Mr. Estell perjured

2   himself at trial on the duress and the coercion issue.  He

3   lied to the FBI.  Even if one of the stories he told was true,

4   he lied to them the two other times.

5          So, under those circumstances, the Court just cannot

6   possibly give Mr. Estell acceptance of responsibility under

7   3E1.  And, therefore, because he gets zero points under 3E1,

8   the combined Advisory Guidelines range is 360 months to life.

9          Mr. Estell also challenges the loss amount in

10  paragraph 37, saying that the money was returned.  It's true

11  the money was returned.  However, the loss amount also can be

12  based upon the intended loss.  That's Guideline 2B1.1.  And

13  there certainly was an intended loss here of over $200,000,

14  so the two-point enhancement is appropriate.

15         The obstruction of justice, I've already -- I've

16  talked about -- the same things I said in denying the

17  acceptance of responsibility under 3E1.1 apply to the fact

18  that there was obstruction of justice under 3C1.1.  It wasn't

19  just that Mr. Estell testified at trial.  I wouldn't impose an

20  obstruction enhancement simply for that.  It's that he told a

21  very, very tall tale, an outlandish and audacious tall tale at

22  trial; and that's what the obstruction is, and also, the lies

23  to the FBI during -- after he was caught.

24         In terms of the double-counting of 34 and 37, it's

25  not double-counting.  There are two separate Guidelines.  They

1    technically apply.  It's certainly something Mr. Estell can
2    raise in 3553(a).
3           But all of these various enhancements that I've been
4    discussing, the loss amount, the obstruction of justice, the
5    double-counting, those are 34, 37, and 40 in the PSR, those
6    really are moot in terms of the technical Guidelines
7    calculation because we already have a career offender status.
8           So, we have the Advisory Guidelines range of
9    360 months to life, and we should talk about the 3553(a)
10   factors.  We've been going for an hour and 15 minutes.  I want
11   to give -- if anybody needs to take a break, most particularly
12   Mr. Estell, I want to give him a chance.  If the prosecutors
13   or any probation officer, if anybody needs five to 10 minutes,
14   anybody in the gallery who would like to be here for every
15   moment of the proceedings, if anybody needs to take a
16   five-minute break, let me know.
17          MR. ESTELL:  I'm ready, your Honor.
18          MR. KING:  I'm ready, your Honor.  May I just have
19   one moment to have someone make a call?
20          THE COURT:  Sure.
21          MR. KING:  Thank you, your Honor.
22          THE COURT:  Would anybody like to take a break?
23          MR. ESTELL:  No.
24          THE COURT:  Okay.  Then we'll proceed.
25          Mr. Estell, you can address -- we're now in the

1   3553(a) stage, and I'm sure you're familiar with the statute;

2   and if you're not, it allows the Court to consider anything

3   about the defendant, and the Court must consider arguments in

4   aggravation, arguments in mitigation in deciding what the

5   sentence should be.

6          The Advisory Guidelines range is one thing the Court

7   must consider, but -- it would be impossible to vary upward,

8   because the Guidelines range is 360 months to life; but the

9   Court certainly can vary downward, and I imagine that you have

10  arguments in mitigation that you'd like to make.

11         MR. ESTELL:  Yes, I do, sir.  Excuse me.

12         Based on the way this proceeding has went, it's hard

13  to tell how -- it's hard to tell how any documents I can

14  provide to the Court will change the outcome of what's going

15  on, but nevertheless, you know, I respect the courts enough,

16  and I will do what I can.

17         Your Honor, I have been given -- let me start by

18  saying, your Honor, when I first was arrested, I was -- I was

19  immediately trying to plead guilty, immediately.  When I first

20  met the prosecutor, it was at my arraignment; and I blurted

21  out to him, against my attorney's wishes, that I would like to

22  plead guilty.  He told me that, you know, I need to speak to

23  my attorney.  Don't talk to him.  I understood that, because

24  protocol says you can't do that.

25         From that point on, I have tried -- I've had three

1    attorneys, three.  And I have tried to plead guilty on all --
2    through all three attorneys.  All three attorneys led me to
3    believe that I should wait.  I should have -- it's a certain
4    time you do things, and they told me to keep quiet.  I never
5    was allowed to talk to you in court.

6            Now, you have -- from what I've seen right now, the
7    Court did not accept what I -- what happened.  And even though
8    I have evidence to show this is not my character, I'm kind of
9    at odds of representing it, because if I show you something
10   that's black and white that shows my character, it still is
11   like disregarded because of the fact that what happened and I
12   lied to the authorities is not going to be believed.  But I'm
13   going to do it just for the sake of the record.

14           This is a document that I sent to the Court.  Let me
15   make sure I show it to the prosecution.  It was June 25th,
16   sir, 2013.  This was five months before my trial.  Here it
17   says, "Returned from the judge, District Court, Bruton."  I'm
18   going to give -- I'm going to show the prosecution first, and
19   I would like to tender it to you.

20           This is two letters that I wrote to the judge, and I
21   would like to read them after I show the prosecution.  Again,
22   these are all documented received, returned and received from
23   the judge.  Let me read it first.

24           Again, I say, your Honor, this was three weeks -- I
25   mean three months, four months before I went to trial.  This

1   is what I wrote to you, and it was sent back to me.

2          It says, "Hello, your Honor.  My name is Charles

3   Estell, case No. 12 CR 416 on your docket.  And as of today,

4   you probably know little or nothing about this case.  However,

5   I'm writing this letter because of a few reasons, and I would

6   like to know how to proceed.

7          "First, let me say I understand why you told me to

8   wait and see how my next lawyer performs before allowing me to

9   go *pro se*, because I am not a lawyer.  And I thank you for

10  that.  I'm just very tired of being ran over by these

11  attorneys, these lawyers, sir.  I have been having problems

12  with lawyers taking my money and giving me bad advice for

13  years.  Even though I didn't pay for these last two federal

14  attorneys, it's not because I don't have the money.  I just

15  feel it's senseless because I keep getting bad advice.

16         "Sir, I wasn't allowed to explain and reason why I

17  fired Kent Carlson during our last court appearance because he

18  spoke up and tried to act like it was me.  But one of the

19  reasons -- but one of the reasons is" -- excuse me for a

20  second.

21         THE COURT:  That's okay.  Mr. Meyer, if you'd like to

22  hand Mr. Estell a Kleenex, there's a box right there.

23         MR. ESTELL:  Thank you.

24         "But one of the reasons is I have been trying to

25  plead guilty to this case from the very beginning, but none of

1    my attorneys have allowed it.  They keep trying to convince me
2    otherwise" --

3              Okay, your Honor.

4              "I didn't understand what I was waiting -- I didn't
5    understand what I was waiting for then, and I don't understand
6    now.

7              "MiAngel Cody did the same thing.  If I approve of
8    this, it seems like they're forcing me to trial.  I knew what
9    I did was wrong from the very beginning.

10             "I know what I did was wrong from the very beginning.
11   I have accepted responsibility from the first day I met the
12   prosecutor at my arraignment and blurted out that I told him
13   that I wanted to plead guilty.  He replied that I shouldn't
14   talk to him and should speak with my attorney.  But that's not
15   working.  They did not listen to what I wanted to do.

16             "Your Honor, I was forced to do what I did.  I just
17   want the chance to say I'm sorry to the employees, and ask for
18   some type of mercy from the Court, because I was a victim as
19   well, and my life has been taken from me because of this
20   senseless crime.

21             "However, I want -- however, I want to know, do I
22   have a right?  However, I want to know do I have to go to
23   trial?  Because I'm constantly being told that I can't talk
24   to you in open court, being told that I have to sit still and
25   let the proceedings go as they should.  I'm being told that

1    you would not know about the actual case until I either plead
2    guilty or through pretrial motions or trial.

3            "Is this true, sir?  Can the prosecution deny me from
4    pleading guilty?  What are my options?  Do I have a right to
5    plead guilty?

6            "I will be trying very hard to get a plea through my
7    new attorney, whomever he or she may be.  I don't want to drag
8    this -- I don't want to drag this out in court and put my
9    family or Court through this unnecessary process.

10           "So, what I would like to know is if I ask for a
11   plea, don't my attorney have to try and make it happen?
12   Because the prosecutor is aware I've tried to plead guilty
13   because I've told him myself.  Either way, I'm not being
14   treated fairly.

15           "Also, because of what I've been told, I'm scared to
16   raise my hand or overtalk my attorney because I'm told that no
17   judge likes for a defendant to speak when they have an
18   attorney.  So, what am I supposed to do, your Honor?  I don't
19   want you to think that I'm being unruly in your courtroom, so
20   I will continue to keep quiet out of fear of getting in
21   trouble by you.  I just hope that I'm not forced to trial
22   because that's a burden I don't want to bear.

23           "This is why I'm asking you for help now because --
24   that happens because I will not upset your courtroom and blurt
25   out my concerns, even though it seems like the only way you

1 will hear about them.

2 "Also, I was told that before trial starts, you will
3 ask both parties if a plea agreement has been attempted, so at
4 least at that point, I will address the Court and say no.  I
5 look forward to that day if all else fails.

6 "Sir, I don't know where to go from here.  I am in no
7 way trying to put this Court through a trial.  The people who
8 did this to me are still out there, and if I can't make a way
9 to get back to them as soon as possible through a plea
10 bargain, I can't protect them.  And that's all I want to do is
11 protect my family.

12 "Also, sir, the prosecution has been asking for codes
13 for my phones, but I don't remember them, and I told him that.
14 But of course, they don't believe me.  So, I would like for
15 you to give the order to give them access, because the truth
16 about what happened to me is in my phones, and I want the
17 courts to know it.

18 "Also, I received a letter from a woman named Trina
19 Johnson, which is attached to this letter as well, as well as
20 the postmark date when I received it.  And this lady says --
21 was saying she recorded these men who did this to me while
22 they were loading guns in her apartment once while she was in
23 the back seat of a car while he was talking about a bank
24 robbery in Oak Lawn and how they made some guy named China do
25 the robbery.  He got caught, and this crew was mad because

1  they wasn't paid for grabbing him.  And they're looking for
2  the dude who was supposed to pay them.

3          "So, she Googled the robbery, and my name came up.
4  She then wrote me and put it on YouTube to ask the public if
5  anybody knew where one of them hung out at, because she needed
6  help to try to find him because he killed her boyfriend.  She
7  obviously thinks we were all working together doing this
8  robbery so she asked me for my help.

9          "Sir, this is proof that these men existed.  She said
10  she went to the police station with two videos of these men.
11  And if she did, how hard is it for the FBI to go to the
12  station and get these the description of these people
13  involved?

14          "Even if they believe I was lying, wouldn't justice
15  be served better if they just made sure?  This is a serious
16  matter, and this would give the agent a positive ID, which I
17  can verify through a lineup, and they can be arrested, not
18  only for bank robbery, but for kidnapping and extortion as
19  well.  The bank employees deserve this justice, too, and these
20  people can be caught with just a little help from the FBI.

21          "So, can you ask my next attorney to investigate this
22  and subpoena this woman?  Because when I brought it to Kent
23  Carlson, he said it meant nothing, and I know that's not true.

24          "Sir, when I first got arrested, I lied to the police
25  because I was scared and I was told if I said anything about

1    them, my family would be killed.  So, I understand why the
2    prosecution doesn't want to believe me, which is why I asked
3    the government for a polygraph test to prove that this really
4    did happen to me, and the answer was no.

5            "Now I'm asking you -- now I'm asking you, can you
6    ask the prosecutor to give me a test so I can prove my
7    innocence?  I know that a polygraph test is not admissible to
8    a jury, but I don't plan on going to trial.  I just want you
9    and the prosecutor to know the truth at my sentencing.  People
10   don't often take polygraph tests if they're lying.  I'm even
11   willing to pay for it myself.

12           "Everything I'm saying in this letter, I have asked
13   my prior counsel to make happen, and I will be asking my new
14   counsel.  So, your Honor, these are things I would like to get
15   done as of right now.  It looks like I have to get my defense
16   ready for trial, so in the next few months, that's what I'll
17   be done.  My defense is ready from my point of view, but I
18   don't have an attorney to bring these issues forth.  That's
19   why I'm writing you this letter because the way I'm being
20   handled by these attorneys is not right.

21           "And I know I'm supposed to turn this letter over to
22   the proper authorities, but how and to who?  When they're
23   either never available or refuse to do the work.  Sir, in
24   light of everything I've brought to your attention, the
25   prosecutors, my last attorney, even the FBI already know these

1    things, and nothing is done about it.

2           "And I get it that it's the fact-finders such as

3    yourself and the jury figure out what evidence is relevant or

4    what not.  I just want the opportunity to present my case as a

5    whole without the prejudice of an unwilling attorney to do the

6    work because it's too much work.  Sir, I don't expect any

7    favors.  I just want a competent attorney to do what the

8    Federal Rules of Criminal Procedure require of him and the

9    platform to be able to present all my evidence to you and the

10   jury, if need be, without prejudice.  That's it.

11          "Thank you sincerely for your ear, and hopefully, you

12   can bring some -- bring some resolve to this situation."

13          Sir, this was a letter I sent to you.  It was sent

14   back.  They've already seen it.

15          This, the letter from Trina Johnson, I have no idea

16   who she is.  See sent me a letter.  This is what she said.

17   It's returned, same thing.

18          "Hello, my name is Trina.  I need your help badly.

19   Now, I don't know if you're the person Moe was talking about

20   in the video I recorded while he wasn't looking, but if you

21   are, please help me.  If not, disregard this letter, and I am

22   sorry for bothering you.

23          "I don't know -- I didn't know this guy Moe very

24   well, but every time I was in his presence, he would brag

25   about the violent things he's done and the people he's hurt.

1  So, a few times, I recorded him while he wasn't looking.

2           "I met Moe through my boyfriend, who is now dead

3  because of him, and he disappeared.  We all got high together.

4  I know him -- I know my boyfriend was with him the night he

5  died."

6           Excuse me.

7           "I've gone to the police with a description of him

8  and two phone videos I recorded of him getting high with my

9  boyfriend while my boyfriend ran to the store and another time

10  at my apartment while they were loading guns.  I figured it

11  would be a long shot, but I have nothing to lose.

12           "I Googled the bank robbery he was discussing with

13  some guy over the phone and your name came up.  If this is

14  you, do you know where Moe hang out at?  Because he needs to

15  be off the street.  And I know once the police question him,

16  my boyfriend's murder will be resolved and my child and I can

17  move on with our lives.  My daughter has lost her father, who

18  she misses and loves dearly, and it hurts to hear her ask

19  about him and I know he is not coming back.

20           "I have gone through a lot since he was killed.  I've

21  lost my apartment because I no longer had his help.  I lost my

22  apartment because I no longer had his help.  I ran away after

23  I went to the police because I think he knows I recorded him

24  those times, and I don't know if I was in harm's way.

25           "I have family in Iowa, but after six months, I chose

1    to come back to get my life back on track.  I knew they were

2    robbing people, but he was a good man, and I would rather him

3    be in jail for the crimes than dead.

4         "As I said earlier, I went to 35th and Michigan to

5    the headquarters to tell them what I knew and who I thought

6    was responsible for my boyfriend's murder.  We now have to

7    find him and question him.

8         "If this is you and you have a heart, can you please

9    help me?  Because one of the last things my boyfriend said to

10   me the night they left together was, 'If something happens to

11   me, Moe is behind it.'  And about seven hours after the police

12   called me from his phone, he was murdered.  He was shot twice

13   in the back of the head.  No one deserves to die like this.

14        "Here is my address for you to contact me if you can

15   help.  3983 South Lake Park, Chicago, Illinois, 60653.

16        "Moe also spoke a lot about someone he shot on the

17   expressway while driving last summer, which is around the same

18   time I videotaped him talking about this robbery.  I decided

19   to put them on YouTube to see if someone knows him better than

20   I do.

21        "Thanks for your help and possibly for the people

22   he's hurt as well as -- thanks for your help, and possibly for

23   the people he's hurt as well, because I think the person he

24   shot on the expressway died, but I'm not sure.

25        "You are my last hope.  I don't know what else to do.

1    Please write me.  Here is the video like that I posted last

2    year on YouTube, www.dot.youtube.com/watch?vi6msvou9soi.  Let

3    me know if this is you.

4            "I will cooperate with the police fully in finding

5    him.  The address is my aunt's.  Please write me back."

6            So, here is August 15th, 2012.  This is my first

7    attorney, MiAngel Cody, and these are the words she sent me

8    when I was -- this is something she told me, and I'll give

9    this to you as well.  I'm quoting your words exactly.

10           "To be clear, my job as your attorney is not merely

11   to follow your instructions.  My job is to advocate for you,

12   investigate, and research your case, understand the facts, and

13   give you my very best and honest advice.  I am not required,

14   nor will I take positions or make arguments that are unethical

15   or strategically unwise.

16           "Here is my sense.  You have gotten yourself in quite

17   a jam" --

18           THE COURT:  Okay.  Mr. Estell, let me step in at this

19   moment.  That's an attorney-client communication, and I want

20   you to know that that communication is privileged, meaning

21   that you don't have to share it with anybody.  So, by reading

22   that letter here in open court, I want you to understand that

23   you're waiving the privilege that would otherwise attach to

24   that letter.  Do you understand that?

25           MR. ESTELL:  Yes, I do, sir.

1          THE COURT:  And you're willing to waive the privilege

2     by reading it in open court?

3          MR. ESTELL:  I'm willing to waive it, yes, I am.

4          THE COURT:  Okay.  Anything else I need to do,

5     Mr. Meyer, in order to --

6          MR. MEYER:  No, Judge.

7          THE COURT:  -- make sure his waiver is --

8          MR. MEYER:  I think it's complete.

9          MR. ESTELL:  Your Honor, just a short paragraph.  I'm

10    not --

11         THE COURT:  You can say whatever you want.  I just

12    want to make sure you know the consequences.

13         MR. ESTELL:  Yes, I do.

14         THE COURT:  Go ahead.

15         MR. ESTELL:  "Here is my sense.  You have gotten

16    yourself in quite a jam.  You are not the first person I've

17    represented who has gotten" --

18         THE COURT:  If you could just slow down a bit,

19    Mr. Estell.

20         MR. ESTELL:  Oh, sorry.

21         "Here is my sense.  You have gotten yourself in quite

22    a jam.  You are not the first person I've represented who has

23    gotten himself into a jam.  The penalties you face are quite

24    severe.  As I've told you from day one, I think you are in

25    such a hurry to wrap up your case that you will make critical

1   mistakes that will hurt you down the road."

2           MR. KING:  Are you tendering the whole letter to the

3   Court?

4           MR. ESTELL:  I just want to show the judge --

5           THE COURT:  Okay.  Are we going to -- so, we have

6   these two other letters.  Should we mark these as Defendant's

7   Exhibit 2 and Defendant's Exhibit 3, Mr. Estell?

8           MR. ESTELL:  Yes.

9           THE COURT:  And would you like that to be marked as

10  Defendant's Exhibit 4 in its entirety?

11          MR. ESTELL:  Yes.

12          MR. MEYER:  And Mr. Estell understands he's waiving

13  the privilege as to the entire contents of this letter.

14          MR. ESTELL:  Yes.

15          Your Honor, this is the letter -- this letter right

16  here is the letter I sent to my attorney Mitchell when he --

17  when I fired him in open court.  I sent him a letter.  This is

18  the reason why we came to court to talk about why he was

19  fired.

20          THE COURT:  And this is the letter from you to

21  Mr. Mitchell?

22          MR. ESTELL:  Yes.

23          THE COURT:  Okay.  Again, you -- that's privileged.

24  You understand by reading it in open court and by introducing

25  it as an exhibit, you're waiving the privilege that would

1    otherwise attach?

2            MR. ESTELL:  Yes, I am.  I understand, sir.

3            THE COURT:  Okay.

4            MR. ESTELL:  As I said, this is only to show that

5    from the beginning to end, I have been trying to plead guilty

6    to this charge.  No one has done helped me.  They are -- they

7    were convincing me that if I would speak up in open court to

8    you, then you're not going to like that, and I would get in

9    trouble for that.  And because of that, I did not do that.

10           Here is my last attorney.  Those are the first two.

11   You've got evidence of the first attorney and then the

12   actual --

13           THE COURT:  Yeah.  What will be marked as Defendant's

14   Exhibit 4 is a letter from MiAngel Cody from the Federal

15   Defenders.

16           MR. ESTELL:  This is -- again, I'm just going to read

17   a small paragraph from the letter that I sent to my attorney.

18           "Also, when the guy from the prison testified, the

19   judge saw that he was crucifying me, and he was supposed to be

20   our witness.  The judge said that you could treat him as an

21   adverse witness, but you didn't.  Why?

22           "Also, I asked you to try to get me a plea, and you

23   didn't.  Why?  I bet the judge had no idea that a plea bargain

24   was never offered, despite you saying it was."

25           I just want to tender that --

1    MR. MEYER:  Okay.  And this is your letter to Mr.
2  Mitchell?
3           MR. ESTELL:  Mr. Mitchell.
4           MR. MEYER:  And what was the date on it?
5           MR. ESTELL:  He has a copy, so --
6           MR. MEYER:  Okay.  And again, this is a multi-page
7  letter, and you're waiving the attorney-client privilege as to
8  the entire letter?
9           MR. ESTELL:  I'm waiving the attorney-client
10 privilege.  Yes, I am.
11          MR. MEYER:  And this would be Defendant's Exhibit
12 No. 5.
13          THE COURT:  All right.  And this is about a 10-page
14 letter.
15          MR. ESTELL:  Yes.
16          THE COURT:  The entire thing will be entered into
17 evidence.
18          MR. ESTELL:  Okay.  Thank you, sir.
19          THE COURT:  Mr. King?
20          MR. KING:  I haven't seen any of these, Judge, just
21 as long as we see a copy if it's important to respond to them.
22          THE COURT:  Okay.  Would you like to take a look at
23 this while Mr. Estell is --
24          MR. KING:  Yes, your Honor.
25          THE COURT:  -- continues his presentation.

1          MR. ESTELL:  Your Honor, again, the reason why I'm
2     bringing these letters to you now is because they have to
3     represent what I was going through.  They have to.
4          What happened on June 2nd was terrible.  I did not
5     try to put this Court through anything.  You have three
6     separate incidents where I've tried to plead guilty.  All
7     three of them were denied, all three of them.
8          Right now, I'm being judged for everything that I've
9     did, what is my past, which I have evidence to show and I
10    think you have read my sentencing memorandum to the extent
11    that you know where I'm going with that.
12         Sir, this is not what I would have done.  Despite you
13    saying that I told a tall tale, despite you saying that, you
14    know, I deceived the Court and -- you're the judge.  I cannot
15    persuade you.  I'm just trying to tell you, this is -- I have
16    evidence to show this is not my character.  This is not what I
17    should be doing.
18         When those things happened with my attorney, I asked
19    them, the prosecution doesn't believe me.  Let me take a
20    polygraph.  And I know it's not admissible to the jury, but
21    that wasn't why I was asking.  I wanted you to know the truth
22    and him to know the truth.  It wasn't allowed.  It was not
23    allowed.  I told them I would pay for it.  It wasn't allowed.
24         So, to say that a person -- I'm going on a limb and
25    creating a lie is kind of -- it's kind of sad, because that's

1    not what I'm doing.  I was trying to show -- go through

2    whatever channels I could to show you that I was not lying,

3    because ultimately, I knew one day I would have to be

4    sentenced.

5         So, that's why I asked the prosecution for a

6    polygraph test, him and the agents.  They said no.  Why would

7    you do that?  If you know I'm lying, why would you not give me

8    a test?

9         Because I was not trying to go to trial, but I'm

10   forced to go to trial.  So what choice do I have?  So, this is

11   why I say in the beginning, me pleading guilty or accepting

12   responsibility, this is what I've been doing since day one.

13   Every attorney had knowledge of this, every single one, and

14   none of them made it happen, from the first to the second to

15   the third.  You have proof of that.

16        Can I still be lying?  Now, that's neither here nor

17   there.

18        Also, this is something else.  The -- the

19   prosecution, when I was arrested, they presented to the Court

20   half of my discovery.  And in the discovery, it listed certain

21   things about me, about the person I was, the convictions I've

22   had, the arrest -- the convictions that I've had, the type of

23   person I was, and anything that could make me look bad,

24   anything.  But certain things, they omitted, and certain

25   things they didn't.

1    My PSI -- to go to show you how everything is like
2  going against me, my PSI -- PSR, my PSR was done; and I read
3  over it, and I caught it at the last minute.  And I guess this
4  is like the last document that was tendered or whatever, the
5  last report.  And this page 27, this is about the financial
6  conditions and ability to pay, and it's 118, paragraph 118.

7    "The defendant completed a signed declaration of
8  network and cashflow statements.  The defendant is a single --
9  the defendant is single and has one dependent minor child.
10  The defendant reported no income or assets due to his
11  detention, has no liabilities against him.  A query of
12  LexisNexis reviewed no real estate properties, motor vehicles
13  to or owned by the defendant."

14    This is what this says.  Your Honor, she says she did
15  a query of LexisNexis and found nothing.  The -- here I have,
16  also part of my discovery, the LexisNexis report that was done
17  by, I guess, the prosecution or whoever.  And, your Honor, I
18  have over half of a million dollars' worth of assets, but I am
19  being charged for bank robbery.  I have over half of a million
20  dollars, and I will tender them to you.

21    And it shows everything.  It shows my real estate
22  assets.  It shows my Social Security Number.  It shows my
23  deeds.  It shows my vehicles.  It showed everything that I was
24  a part of either then or now.  It shows everything that I was
25  a part of.  And this is over a half million dollars' worth of

1    assets, sir, which goes to my mitigating factor.

2           I am being charged for bank robbery.  I am being

3    charged with taking money from a bank.  I have businesses that

4    I have that's involved in my PSI -- that's in my LexisNexis

5    that's in my name.  I have businesses that are in my name,

6    sir.  I have been charged for bank robbery.

7           Yes, the crime was committed, no doubt about that;

8    but it has to go to -- it has to go to the actual -- the heart

9    of the issue.  This is not something I needed to do.  This is

10   not something I would have willingly done.

11          And I don't know what exhibit this is by now because

12   I've tendered quite a few of them, but I circled and I've

13   highlighted some things for you to see, your Honor.

14          I have my business in here.  I have my business.

15   There were three real estate properties found that I was

16   either a part of creating or listing my name; a deed of trust

17   for one of my properties, with my name and Social Security

18   Number on it; the restaurant that I own that's in my name,

19   along with my Social Security Number attached to it; the condo

20   down on -- when I was arrested for the offense that had my

21   name attached to it.

22          I say again, sir, these are things that I cannot --

23   this is what evidence that I'm just trying to show you that

24   creates the doubt, that the jury was not allowed to see, nor

25   were you.  So of course, if you tell the jury that a person

1    just robbed a bank and you say, "How was he?  Oh, he was a
2    broke person.  He never had a dime in his life," of course the
3    jury's going to say, "Yes, he's guilty."  They're going to
4    say, "He's guilty," sir.

5         The jury -- the prosecution presented -- the
6    prosecution presented a video prompt that said that -- that
7    showed that I made a text message to one of my friends.  Of
8    course, I'm pretty sure you remember, sir.  I sent a text
9    message to one of my friends saying that he need to give me my
10   money back because I was broke and my lights might get turned
11   off.  And yes I made that text message, sir, but that wasn't
12   in context of my lights are being turned off.  That was a
13   metaphor that people use to say, "Hurry up.  Give me my money
14   back."

15        Here is money that I was buying cars with during the
16   time -- not cars, I'm sorry, property, rims for my car during
17   the time that I made this text message.  Here is a exhibit --
18             MR. MEYER:  This would be Exhibit 6.
19             MR. ESTELL:  Exhibit 6, your Honor.  Here is a piece
20   of paper saying that while they was saying I'm broke, I need
21   some gas money, I need some light money, I just spent $2,000
22   for some wheels for my truck, sir, one of my vehicles.  But
23   the prosecution told the jury that I'm broke and this is what
24   I need to do.  This was a couple of months before that
25   happened.

1    THE COURT:  Okay.  This is Exhibit 6.  It's a receipt

2  from Exotic Wheel Boutique on South Western Avenue in Chicago

3  dated March 9th, 2012, showing the purchase of $2,000.

4    MR. ESTELL:  Now, sir, this is -- this is -- again,

5  this has to go to the heart of what I'm saying.  Now, I don't

6  know if this is enough to show you what I was doing.  I don't

7  know, sir.  But I'm not a robber.  I'm not a bank robber.

8    My whole life is just creating properties and trading

9  commodities.  I don't know if you're familiar with that,

10  Chicago Board of Trade, Mercantile Exchange, Swiss frank,

11  Japanese yen.  This is what I do.  I'm not a robber.  But as I

12  stand before you, I'm charged with bank robbery, and I'm

13  convicted of it.  I get that.

14    But the things that I've said to you, they was not a

15  lie.  The prosecution, I get it, your Honor, it made it seem

16  like some of the things that were being said were outlandish;

17  and the way it was presented, of course I'm guilty.  The way

18  it was presented, I'm guilty.  But that's not the truth.

19    I didn't just tell the prosecution three people

20  hopped out of the sky and kicked in my door and kidnapped me

21  and told me to rob a bank.  Who'd believe something like that?

22  Nobody would believe something outlandish as that.

23    I am almost a 40-year-old man.  I have everything

24  going for me, everything.  There is no way -- there was no

25  reason for me to do this.  I can't -- and I say again, it goes

1  to the heart of the matter.

2          Here I am presenting you with documentation that I
3  was not supposed to be doing this.  So, with that being said,
4  doesn't that deserve the opportunity to be heard?  Well, wow,
5  if this man can show me a half million dollars' worth of
6  assets, do I really have to -- I mean, is it -- shouldn't it
7  be considered that this is probably what he would not have
8  done?

9          Here, you guy's whole defense is that I am a robber,
10 which means -- that means one thing:  Anybody that robs a bank
11 is doing it for money.  And I'm not saying that I'm rich
12 because or I have a million dollars, because I don't.  But I'm
13 in now way need to rob a bank, sir.  That's all I'm trying to
14 say with this piece of information, those documents that I
15 presented to you that neither the jury nor you heard that the
16 prosecution had.

17         THE COURT:  Okay.  The only document I have right now
18 is the receipt from Exotic Wheel Boutique.  I don't have any
19 other documents in front of my right now.

20         MR. ESTELL:  I'm sorry.  This is the LexisNexis,
21 which I'm pretty sure he has a copy of already.  I would like
22 to tender it to you, sir.

23         MR. MEYER:  And this would be Defendant's Exhibit
24 No. 7.

25         THE COURT:  Did you take a look at that?

1          MR. KING:  That's okay.  I don't need to, Judge.

2          THE COURT:  And Defense Exhibit No. 7 is -- looks

3    like a -- well, it was actually produced in -- it has Bates

4    stamps 362 to 374.  Are these the government Bates stamps?

5          MR. KING:  Yes, your Honor.

6          MR. ESTELL:  Yes, sir.

7          THE COURT:  Okay.  So, it's a LexisNexis printout

8    that's 13 pages.  This will be Defense Exhibit 7?  7.

9          MR. ESTELL:  Sir, also, I have this -- I want to make

10   sure that I cover everything, because right now, I'm fighting

11   for my life.  And I have put a -- numerous amount of motions

12   in front of you.  I have stood in front of you quite a few

13   times, and everything that I've asked have been denied.  And

14   if that's what it is, then so be it, sir.

15         But all of my life, I have been asking for help.  The

16   things that happened to me didn't start June 2nd.  They

17   didn't.  And again, I have proof of this.  It didn't start

18   June 2nd.  Nobody will create turmoil or put their self

19   through years and years of anguish to come up with an alibi

20   for a robbery five years later.  Who does that?  Nobody would

21   put their self through something like that, sir, for five

22   years, and then come up and say, "You know what, this is the

23   reason why I'm really robbing the bank, because I made up an

24   alibi saying that someone tried to kill me in the past or

25   someone purposely didn't really kick in my door.  It was just

1    a B.S. alibi to come up with something for a bank robbery in
2    2012."  Sir, nobody does that.

3              And with that being said, sir, these are things that
4    I wanted to tender to you as well, mitigating factors.  The --
5    here is when I was charged for carjacking and kidnapping.
6    Now, at the time of this arrest, your Honor, I had a
7    restaurant -- I had a restaurant, and you have documentation
8    of that.  And here is -- actually, here is the name of my
9    restaurant with my name on it.  This is the department of --
10   IRS Department of Revenue, and I can give it to the
11   prosecution.

12             Your Honor, at the time of this restaurant -- excuse
13   me, the time of this robbery, your Honor, is one of these
14   crimes that I'm being charged with for my career status, I
15   was -- I owned a restaurant.  I had two pieces of property at
16   this time.  I had a condo downtown.  And I was charged with
17   kidnapping and carjacking.

18             My bond was a million dollars, sir.  I had it reduced
19   to 400,000, 500,000, one of them.  I can't remember.  My bond
20   was reduced, sir.

21             MR. MEYER:  Judge, I think the last exhibit was 8,
22   so this one should be 9, which is correspondence from the
23   Illinois Department of Revenue to Mr. Estell.

24             THE COURT:  Okay.  And I don't know whether it's 8 or
25   9, but at the end of the hearing, I'm going to hand all the

1    exhibits back to counsel and -- standby counsel, and if you

2    could mark them, get them to the courtroom deputy, we'll get

3    copies made or maybe you can get copies made, Mr. King.  I

4    don't know if you have a copy machine in your office.

5              MR. KING:  I do.

6              THE COURT:  And let's just make sure everybody, the

7    Court, the defendant, and the government have copies of all

8    the exhibits.

9              And this is a January 4th, 2005, letter from the

10   Illinois Department of Revenue about a past -- a 10-day demand

11   for a past-due account.  And it will be -- and it looks

12   like -- and then there's something from the IRS from 2004, a

13   notice, and it's addressed to Charles Estell, Momma G's Place,

14   at 11940 South Union.

15             MR. ESTELL:  Sir, I want to make sure I stay on track

16   because these are the mitigating factors that I'm trying to

17   bring to your attention.  And it's the history.  It's

18   everything that happened to me started from the point of 2007

19   until now.  My life has been, like, down from that point.  And

20   not but because -- it wasn't because of me needing money or

21   anything.  It was because of the things that I went through

22   with the judicial system.  From that point down, I have had no

23   luck.

24             I was -- I was charged for kidnapping and carjacking

25   in 2007.  The charge came from 2005.  They said they was

1  looking for me for two years.  Now, I'm on probation, your
2  Honor, federal probation.  I'm reporting every month.  I don't
3  have no write-ups, nothing.  I'm reporting every month.

4  They pulled me over in my Range Rover.  They said
5  they was looking for me.  They arrested me, sir.  They
6  arrested me.  And again, I have documentation that I will
7  show you.  They arrested me for kidnapping and carjacking.
8  They say I was a part of a lady being kidnapped, and because
9  of this, I took her car and drove off with it, your Honor.

10  And I have -- again, this is the documentation.  This
11  is the -- this is the actual charge.  I will be showing the
12  prosecution, and I will be showing you.

13  Sir, the reason I mention it is because this is how
14  bad my -- this is what I'm being judged off of right now.  I
15  am possibly being careered off of a case that I had nothing to
16  do with.  But because I had bad attorneys lying to me and
17  telling me what I should do, I pled guilty to this.

18  MR. MEYER:  And, Judge, this would be --

19  MR. ESTELL:  Excuse me, sir.  Let me admit this so we
20  just won't continue admitting pieces and pieces of evidence.

21  THE COURT:  Okay.  Mr. Estell, what I'm about to say
22  is not cutting you off.  I just want to know how much longer
23  do you have?

24  MR. ESTELL:  Five, 10 minutes, sir.

25  THE COURT:  Okay.  Because I am going to want to give

1  people a break.  We've been going for about two hours.

2         MR. ESTELL:  Can I have 10 minutes and I'll be

3  through?

4         THE COURT:  That's fine.  And again, if you have

5  longer than that, we can take a break, and we can come back,

6  and you finish up.

7         MR. ESTELL:  No, I have 10 minutes, sir.

8         THE COURT:  Ten minutes?  Okay.  I'm not -- just so

9  it's clear, I'm not cutting you off.  I'm just wondering when

10  would be an appropriate time for a break; and then if you need

11  to continue after the break, you're entitled to do so.

12         MR. ESTELL:  Your Honor, the only reason why I'm

13  presenting these facts to you is because this is my history.

14         THE COURT:  Again, you don't -- I'm not asking you

15  for an explanation on anything as to why you're talking to me.

16  I understand why you're talking to me and making your

17  presentation.  It's simply a matter of when we're going to

18  take a break.  If you have 10 more minutes, that's fine.  If

19  you have longer, that's fine.  At some point, though, we're

20  going to have give people --

21         MR. ESTELL:  Opportunity.  I get it.

22         THE COURT:  -- a break, including the court reporter.

23  And then we'll continue after the break.

24         MR. ESTELL:  Okay.  Your Honor, this is -- I pled

25  guilty to carjacking.  I pled guilty to carjacking.  They

1   threw the kidnapping out because they knew I had nothing to do
2   with it.  I pled guilty to carjacking, sir.

3          Now, I was on bond.  The carjacking -- which I have a
4   document right in front of me.  I was on bond for $500,000.
5   They say I took a Saturn, a 2005 Saturn from a lady.  Why I
6   would do that?  Just -- whatever.  I was on bond, your Honor,
7   for a 2005 Saturn, a half-a-million-dollar bond.

8          I had a bad attorney that advised me of something
9   that I should do to make the case go away.  And me not being
10  knowledgeable of how things went, I pleaded guilty to that,
11  sir.  It wasn't because I was guilty.  It was because I was
12  trying to get the case over with to get home to my family.

13         Now, today, I stand in front of you, and I am being
14  charged -- I am about to be careered off a case that I had
15  nothing to do with.  This is part of the evidence.  Let me
16  give it to the prosecution.

17         I don't know if you're familiar with Stewart
18  Goldberg, but he's a high-priced attorney in the state,
19  another $25,000 I had to pay to him to crack the case.  It
20  just went on and on and on, sir.  I never had any reprieve
21  from getting bad advice.  When I paid for it, I got bad
22  advice.  When I didn't pay for it, I still got bad advice.

23         So, this is my point.  The reason I pled guilty to
24  this charge, so I can move on, was because I was given bad
25  advice by my state attorney.  And now today, as a result of

1   that, I have a criminal history on my docket -- I mean on my

2   Presentence Investigation Report that's possibly -- that's

3   about to be making me a career offender.

4               MR. MEYER:  Did you want these marked as exhibits?

5               MR. ESTELL:  If it please the Court.

6               MR. MEYER:  Judge, I will tender to the Court --

7   these would be Defendant's Exhibit 10, the arrest warrant for

8   the vehicular hijacking; No. 11, this is an order entered on

9   April 14th, 2007, in the same case; and lastly -- this would

10  be 11; and then 12 would be the appearance for Mr. Estell in

11  that case by Stewart Goldberg.

12              MR. ESTELL:  Sir, when I bonded out for these cases,

13  when I bonded out for these cases, this is when -- this is

14  when I was -- I was -- they tried to kidnap me.  I was

15  presumed to have been a person of every robber's dream because

16  I had money, and they had heard that I had bonded out for half

17  a million dollars.

18              So, at that point, sir, they tried to kidnap me.

19  When they did that, I got away, but it was a -- it wasn't a

20  casualty, but I hurt myself in the process.  I hurt myself in

21  the process.

22              And this was -- all this was during the time right

23  after I paid the bond.  This was a month later, they tried to

24  kidnap me.  They tried to pull up on the side of me, and they

25  tried to snatch me in their van.  I got away.  I crashed into

1   a tree about 60, 70 miles an hour and broke every bone in my
2   body.  Because of this, I was going to court in a wheelchair.
3   I was going to court.

4          And my point of saying this is because it was
5   documented that these people did it to me from the beginning,
6   as early as 2007.  It's been documented.

7          Here is a -- I don't know how you guys do it, but I'm
8   pretty sure you guys.  It's an arraignment order, and it's
9   order when a judge writes in his pad about certain things of
10  the case.  And what it says is, it says, "Defendant is in the
11  hospital paralyzed in a wheelchair, kidnap victim."  This is
12  like an order.  Again, I will tender it to the prosecution,
13  and he can give it to you.

14         Your Honor, this is what -- when they came to see me
15  in the hospital, I told them I was a victim of a person trying
16  to kidnap me.  This is what went on.  I told them that.  This
17  is what I told the police.  No one was ever arrested.  Nothing
18  has ever been done, from beginning to the middle to even right
19  now.  No one was ever arrested.

20         I've been going through this through the whole time.
21  No one has ever been arrested.  Why is that?  I say again, the
22  reason why I mention this is because it goes to the heart of
23  the matter.  I cannot create five years of turmoil to create
24  an alibi for a robbery.  That just doesn't happen.  That just
25  doesn't happen, sir.

1      Here is -- here is another -- well, this say the same

2   thing as that, just saying that the defendant is not in court.

3   He's in a wheelchair.

4      As part of pleading guilty to this crime, sir, of

5   carjacking and kidnapping, I pled guilty, and I was sentenced

6   to prison.  Because of the bad advice, I was sent to prison.

7      Now, I don't know if you're familiar with how the

8   bond thing goes in the state court, but they give you your

9   bond back.  After you plead guilty or whatever, they refund it

10  to you or your attorney.  Here is another paper that I have

11  where they refunded my bond money back.

12      So, this is another -- this is affirmative proof that

13  when I came home, your Honor, I had money.  You can go off of

14  this.  I had money.  There was no reason for me to rob

15  anybody.

16      This is just -- and I'll say again, these are -- I'm

17  giving it to the prosecutor now.

18      These are things that show that this is not something

19  that I would do.  There was no reason for me to do this,

20  regardless of what the jury believed and the Court believes,

21  sir.  This is not my lane.  This is not something that I would

22  do.  I don't know how to explain it to you other than showing

23  you proof of actual me going through this.

24      MR. MEYER:  Judge, I'll tender as Defendant's

25  Exhibit No. 14, it looks like a docket sheet in case

1    No. 07 CR 1021001, which is a Cook County record.

2        And then 15 is another docket sheet from the case

3    of -- case No. 07 CR 0906101, and that would be 15.

4        THE COURT:  Thank you.

5        MR. ESTELL:  Now, sir, what you're seeing, I'm going

6    to say it again.  These are the things that I went through

7    while I was going to court.  I was the victim of attempted

8    kidnapping.  They tried to grab me, and I got away.  They only

9    tried to grab me because I had money, because I had money,

10   sir.  They tried to kidnap me.  They tried to put me through

11   all this turmoil.

12       Now, let's fast-forward to while I'm in jail.  I'm in

13   jail for this crime.  I calls home, and -- no, I'm sorry.  Let

14   me just slow down a little bit.

15       After I got out of the hospital, my brother, he was

16   almost attempted to be snatched because of me.  They shot him

17   twice.  He got away.  He went to Christ Hospital, shot him in

18   the butt, shut him in the stomach.  He got away, trying to --

19   for me to give them some ransom money, because they knew that

20   I had money.  They shot him twice.

21       Right now, my brother is in Greenville.  He's in

22   prison, federal prison right now for a drug conviction.  But

23   nevertheless, this is what happened.  These are all the things

24   that I've been going through.

25       THE COURT:  All right.  Mr. Estell, right now, I'm

1   going to have to give the court reporter a break, and if you
2   have more things to say --
3           MR. ESTELL:  That's fine.
4           THE COURT:  -- we can pick up with where you left off
5   when we get back.
6           The question is how long of a break should we take?
7   It's now 20 to 1:00.  How much longer do you think you have?
8           MR. ESTELL:  I have a few more exhibits to present.
9   I'm going to say 10, 15 minutes.
10          THE COURT:  How long -- and then you're going to have
11  Ms. Randle address the Court, is that correct?
12          MR. ESTELL:  Yes, yes.
13          THE COURT:  Okay.  And then I'm going to turn it over
14  to the government, and you're going to have Miss Heisterman,
15  is that right?
16          MR. KING:  Yes, your Honor.
17          THE COURT:  And you're going to have some things to
18  say?
19          MR. KING:  Yes, your Honor.
20          THE COURT:  How long do you think you're going to be?
21          MR. KING:  I would hope 10 minutes or less,
22  10 minutes call it.
23          THE COURT:  Okay.  And then I'm going to hear from
24  Probation if Probation has anything else to say.
25          So, the question -- let me ask you, would you like to

1    take a 15-minute break right now or an hour break right now?

2    I'm asking the prosecutor, and then I'll ask Mr. Estell.

3         MR. KING:  Your Honor, if you don't give the staff a

4    lunch break, they're not going to get one probably until 3:00,

5    and so I think the staff probably -- I can do whatever the

6    Court -- I've cleared my calendar for the afternoon, so I can

7    accommodate the Court in any way.  I think 10 minutes might be

8    on the short side, but if the staff needs to --

9         THE COURT:  Okay.  Why don't -- Mr. Estell, what are

10   your thoughts?

11        MR. ESTELL:  I agree.  I think you should let

12   everybody have something to eat, sir.

13        THE COURT:  Okay.  Then why don't we take a break for

14   an hour, and we'll reconvene -- and I apologize if that causes

15   any hardship to the folks who are in -- on the benches and who

16   are attending this proceeding; but it's going on for a little

17   long, so we'll take an hour break.  We'll get back together at

18   a quarter to -- at a quarter to 2:00.

19        And, Mr. Estell, you're in the middle of your

20   presentation, or you're not done with your presentation, and

21   you can certainly enter the exhibits you'd like to enter and

22   make the presentation that you'd like to make.  And then we'll

23   hear from Miss Randle, and then we'll turn it over to the

24   government.

25        MR. KING:  Thank you, your Honor.

1    (Lunch recess had.)

2         THE CLERK:  12 CR 416, USA versus Estell.

3         THE COURT:  Good afternoon.

4         MR. KING:  Good afternoon, your Honor.

5         THE COURT:  If everybody can make their appearances

6    again.

7         MR. KING:  Patrick King appearing on behalf of the

8    United States, together with Melissa Goldman.

9         MR. ESTELL:  Charles Estell.

10        MR. MEYER:  And John Meyer as standby counsel for

11   Mr. Estell.

12        MS. KWONG:  Kelly Kwong on behalf of Probation.

13        THE COURT:  Good afternoon.  Mr. Estell, we were --

14   you had not yet finished your presentation, so if you'd like

15   to continue, you may.

16        And again, if anybody who's not addressing the Court

17   would like to be seated, you're welcome to do so.  If you'd

18   like to remain standing, that's fine as well.

19        MR. ESTELL:  Thank you, your Honor.

20        As I was saying, the only reason why I was bringing

21   up the cases that happened from my background was because

22   those cases are the reason why I would be careered or not; and

23   based off those cases, I think it should be noted that my past

24   is something that I didn't intend on -- it wasn't my intention

25   of doing.  I was given every opportunity to do the right

1    thing, and I did that to the best of my ability.

2          The information that I have given you thus far only

3    details some of the things that I have went through at the

4    hands of the people before this crime even happened.

5          Things -- things don't happen, where I come from, for

6    no reason.  People either target you or they -- excuse me, let

7    you live.  They don't bother you.  And this is the case here.

8          When I was on bond for the case I gave you,

9    half-million-dollar bond, the reason why the case happened was

10   because the guy wanted to borrow my work van, and I was in my

11   restaurant.  And I told him, "Bring it back before I close,

12   and you can have it."  He lied to me, told me he needed it

13   because he wanted to help somebody move or whatever.

14         To make a long story short, your Honor, he and his

15   codefendant, they go and rob some lady.  They kidnap her, and

16   they get caught like 20 seconds later, literally 20 seconds

17   later.  And he was arrested.

18         My van -- of course, I reported my van stolen.  I

19   reported it stolen, sir, and before the night was over with,

20   he never showed up to my restaurant.  So I closed my

21   restaurant and went home.

22         Two days later, they called my mom and said, "Listen

23   we have this van reported stolen."  Inside of my van was my

24   bank books.  I left my wallet by accident.  I have my check

25   stubs from my company.  Everything was in my van.

1          So, based off that, they assumed that I was involved,

2     because they said the guy told them that I sent him to do it

3     and I gave him the vehicle to do it, and we did it, I was the

4     person who set it up.

5          Now, at this time, your Honor, I'm having -- I'm in

6     the height of my life.  I'm having -- I'm doing everything I

7     need to do, everything.  Business-wise, family-wise, property,

8     I'm doing everything.  There would be no need for me to do

9     anything like that.

10         So, nevertheless, the reason why I'm arguing that

11    point is because that case is ultimately one of the cases that

12    I've been careered off of; and I don't think it's fair that I

13    was even found guilty, but I pled guilty because for one, I

14    had bad representation.  And number two, I was part

15    responsible because I should have known better for allowing

16    myself to be helpless to help somebody like that.

17         Needless to say, I pled guilty to carjacking.  They

18    threw the bank robbery out -- I mean, they threw the

19    kidnapping away, and I pled guilty to carjacking, because they

20    knew I had nothing to do it; but my vehicle was involved, I

21    pled guilty to that.

22         Your Honor, I was -- as you see the evidence, what

23    you have in the police report, I was on a half-million-dollar

24    bond for a carjacking of a Saturn.  And I did the homework on

25    that.  The BlueBook value of a Saturn is probably $3500.  So,

1  minus -- plus my attorney fees, I was way above -- my point
2  is, sir, that wasn't what I was doing.

3          Moving on, when I was in jail -- I'm doing my best to
4  bring it up to speed to the current case.  When I was in jail
5  for the marijuana conviction in California, they kicked in my
6  home, right?  They tried to -- looking for money or whatever.
7  They had no reason -- they didn't know I was in jail or not.
8  They kicked in my home; and my fiancee was at work, and they
9  were looking for money.  They ransacked it, whatever they did.
10 They didn't take anything.  They were just looking for -- they
11 turned over the couches and things like that.

12          And my fiancee had to call her father to come over
13 there to be there for her because I wasn't there.  And that's
14 what he did, and I thank him for that.

15          The reason why I'm saying that is because it's been
16 ongoing.  It hasn't stopped, period.  It's been going on four
17 or five years before this crime even happened.  They kicked in
18 our door.  We filed a police report, and I have the police
19 report right here in front of me.

20          We filed a police report, your Honor, and nothing was
21 done, nothing, nothing.  The police came, did the report, and
22 didn't follow up at all.  Forced entry.  I will provide you a
23 copy as well, sir.

24          Now, right after that, I come home -- your Honor, I
25 come home, and I immediately get my life together.  I mean,

1   even though it wasn't in array before I left, I immediately

2   get right on top of what I'm supposed to do.  I started going

3   to school for paralegal studies.  I started -- I was cutting

4   hair on the side.  It wasn't because I needed the money, but I

5   was cutting hair on the side to appease the probation officer.

6   I was cutting hair on the side.  I was going to school, and I

7   was taking care of my family.

8          Now, here is a -- here is a probation report from

9   the probation officer that says in part, "The offender was

10  complying with rules of IDOC, making regular check-ins and

11  continuing his face-to-face contact, regular drug testing,

12  maintaining current employment.  Offender was recommended

13  early release and level reduction due to consistent

14  compliance."

15         Here is another thing that also comes from the -- my

16  discovery that, again, the prosecution has.  It's a note where

17  the parole guy was talking about the things I was doing, and

18  he states that, at this time, I was unemployed, but I was

19  working -- I mean, I was going doing school at Carpenter

20  University.

21         Your Honor, these are -- I was on track.  There would

22  be no reason for me to deviate from that to go and rob a bank

23  when I've got everything in my life going for me.

24         And it's just ironic that both times in my life that

25  something has went wrong, I was doing good financially.  The

1    very first time was when the carjacking and kidnapping thing

2    happened.  I was doing good, your Honor.  I wouldn't be

3    taking -- I wouldn't be doing nothing like that.

4           Now, on this case, I'm doing swell.  There would be

5    no reason.  These are documentations of the people who are

6    vouching for me that say, "This guy is out here actually doing

7    like he's supposed to do."

8           So, is it to believed that I'm going to school, I'm

9    doing what I'm supposed to do, in the morning and the daytime

10   I'm going to school, doing what I'm supposed to do, but at

11   nighttime I'm a bank robber?  It just doesn't make sense.  It

12   shouldn't make sense to anybody, so why should it make sense

13   against me?

14          And the only reason I'm being judged so severely is

15   because of my background.  I mean, let's -- to me, let's be

16   serious about this.  Had I not had the background that I

17   had -- and I understand I lied, but had I not had the

18   background that I had, my story would have been believed or

19   they would have investigated it further.  But because of what

20   I went through and technically I come from a taken background,

21   then automatically, I'm assumed to be guilty anyway.  But

22   these things I'm going through, I'm showing you documentation

23   that I was living right.  I wasn't doing wrong.

24          Now, as I say -- as I say, your Honor, I had the -- I

25   had the attempted robbery on my home.  They kicked in my door.

1  I had the -- they tried to kidnap me, which I showed you
2  evidence of.  I had the -- right after the incident, right
3  after the incident, your Honor, they -- when I got arrested,
4  my fiancee was riding down the road in one of my vehicles.
5  They pulled up alongside of her and ran her off the road,
6  trying to stop her, pull her over for whatever reason.  Who
7  knows?  But again, a police report was filed.  Now, I'm
8  already arrested, sir.  Nothing is done, nothing.  No police
9  get involved.  Nobody do nothing.  They take a report, and
10 they keep it moving.  Nothing is done.

11       Again, she's being harassed.  She goes to the police
12 station.  Nothing is done.  She makes a report, sir.  Nothing
13 is done.  And I've got all the police reports.  I have in
14 front of me five police reports right here, sir.  Two of them
15 were before the case, and the other three were after.

16       Here is another police report where they took my
17 vehicle.  This was January 22nd, 2013.  All of this is not a
18 coincidence.  You know, it's not a coincidence.

19       And like I say, here are five police reports that I
20 will tender into the evidence for the Court to see, as well as
21 the prosecution, as well as the monthly reports from my
22 probation officer, him citing that I was doing what I was
23 supposed to be doing.

24       Your Honor, I'm going to try to make this as fast as
25 possible because I understand that I want to make an

1   opportunity for the prosecutor to speak, and I want to give

2   everybody a chance to speak, because I know I've probably

3   bogarted the Court for a while.  But this is my life, sir, and

4   I'm trying to explain to you the best I can that this is not

5   what I have done.

6          Despite how it sounded on the stand, despite how the

7   prosecution gave it to the jury and yourself -- and I don't

8   even know at this point what frame of mind, if a sentence is

9   already in your head or not, but that's neither here nor

10  there.  But I just really want to show you that my pattern of

11  life that I was going in would not have allowed me to do

12  something like this.

13         I'm going to speak a little bit about the actual

14  incident, and I'm done, sir.

15         Two weeks before the case happened --

16         THE COURT:  By the way, the matters that you were

17  just referring to, are there any exhibits, Mr. Meyer, that he

18  wanted --

19         MR. ESTELL:  Yes.

20         MR. MEYER:  Mr. King is reviewing them.

21         THE COURT:  Okay.  Mr. King's looking at them.  Let's

22  just make sure, Mr. Meyer, you'll be the traffic cop in terms

23  of the exhibits, and you'll make sure that I get everything

24  that Mr. Estell would like to have part of the record.

25         MR. MEYER:  I will.

1        MR. ESTELL:  Thank you.

2        Your Honor, two weeks before this robbery, I called

3    9-1-1, and I reported to them what was going on.  I called

4    9-1-1.  I have the copy here.  I said, "My name is Charles

5    Estell, and I would like for you to send me a patrol car

6    because some people who I have ran across in the past are

7    trying to extort me now."  I have the phone call.  I told the

8    police -- the prosecution this.  They did not follow up on it.

9        Now, I am being accused of being a person who carries

10    a gun.  I'm being accused of robbing this facility.  I'm being

11    accused of robbery.  I'm being accused of toting a gun.

12    People who tote guns where I come from, the South Side of

13    Chicago, no matter how good or bad it may be, either you're

14    good or you're bad.  I am being charged for being a bad guy,

15    sir.

16        That does not coincide with me calling the police.

17    You know, if I have a gun, I'm a thug.  If I have a gun in my

18    presence or in my home or whatever, there would be no reason

19    for me to be calling the police for anything whatsoever, ever

20    in life.  This is just common sense.

21        Now, these are the things I'm presenting to you that

22    were not presented to the jury.  So, I'm not going to go too

23    much into it, because some things were obviously presented to

24    the jury.  I'm only bringing things to your attention that was

25    not brought to your attention.  Maybe they can give you a

1    different perspective of what happened.

2           Sir, I called the police.  I called the police three

3    weeks before this incident.  I told them what happened.

4    Nothing happened.  And I tendered the phone records for that.

5    Whenever the prosecution finish -- here is the phone records

6    for that.  Here's the 9-1-1 call.

7           My thing is:  Why would not the agents just go and

8    get that phone call so they can hear what I'm actually saying?

9    What is the harm in that?  If you are agents and you're

10   involved in investigating this case, why not just try and see

11   if what this man is saying is true?  What is the harm in you

12   going to the police station and subpoenaing the records or

13   whatever and finding out whether what I was saying is true?

14          I can't understand that, because right now, I've been

15   accused of everything that I say is a lie.  Everything is a

16   lie.  And I don't see how, when the evidence is not supporting

17   that.

18          Sir, after -- after the actual case happened, robbery

19   happened, and weeks came by -- three weeks went by, and the

20   prosecution as well as a couple of the agents and my attorney,

21   MiAngel Cody, they came to me, and they -- we had a proffer

22   meeting.  And during this proffer meeting, before we started

23   talking about anything, your Honor, before we started talking

24   about anything, I asked the prosecution and the agents, "Can

25   you please provide some protection for my family?"

1    This you did not know, nor the prosecution -- I mean
2  nor the jury.  I asked them, "Before we talk about anything,
3  can you please offer protection for my family?"

4    They said, "No."

5    I said, "Okay.  Well, can you please -- if you won't
6  give them protection, can you please put someone on my house
7  for two weeks, just to -- just in case something happens and
8  you can catch whoever's involved?"

9    They said, "No."

10    At that point, there was no reason for me to go ahead
11  and volunteer what really happened, even though I know it was
12  wrong for lying.  I know it was wrong for lying, but I was
13  faced with the prosecution denying me the right to protect my
14  family just to solve the case.

15    This is why I lied.  It does not make it right, sir.
16  It does not make it right.  I don't support lying in no shape
17  or form.  But what I'm faced with is, "I'll tell you what
18  happened and you help me.  If you don't help me, what makes
19  you think I'm going to put my family at risk just so you can
20  close the case?"

21    And that's what it was.  I'm not going to -- I just
22  can't see myself doing that because if something would happen
23  to my family -- if something would happen to my family, how
24  would I explain that?  How could I explain to her father --
25  excuse me, sir.  Excuse me.

1    MR. MEYER:  Judge, can we make a record on these next
2    exhibits?
3            THE COURT:  Sure.
4            MR. MEYER:  Defendant's Exhibit 16 would be -- would
5    provide the police reports that Mr. Estell referred to.
6    Defendant's Exhibit 17 would be a parole violation report,
7    and attached also are Bates numbers 644 and 645 from the
8    government discovery.  And then Defendant's Exhibit 18 would
9    be the Sprint records detailing the 9-1-1 call on May 8th.
10           MR. ESTELL:  Your Honor, if I would have something
11   happen to my fiancee and my child, what would I tell her
12   father or her family?  And I know these are questions that you
13   cannot answer right now, but they have to be acknowledged.
14           Because from what I'm sensing is everybody thinks I'm
15   guilty, everybody.  Despite me showing proof after proof after
16   proof, everyone thinks I created a ridiculous story out of
17   nowhere to come up with an idea or alibi for a robbery five
18   years in the making.  I just created -- I'm not saying this is
19   you, sir, but I'm just saying I -- it's the temperament I'm
20   getting from this Court is that five years prior, I just
21   created a mountain of turmoil for my family to come up with an
22   alibi for a robbery in 2012.
23           Sir, the letters I gave to you about me pleading
24   guilty to -- I was trying to present to you, that I presented
25   to you, those are letters that happened at the beginning of

1   this case; and as I say, I was diligently trying to plead

2   guilty, sir.  I was not trying to put this Court through no

3   kind of trial because I didn't want the victims to go through

4   that.  I didn't want the government to have to bear the burden

5   of paying for this or that when I know I'm guilty.

6          And with that being said, there were things in the

7   letters that I presented to you about the phone call.  Now,

8   your Honor, you have -- you have documentation -- and you were

9   present at my trial.  You were very observant.  You have

10  documentation of the actual phone records of my phone.

11         And the government put an exhibit on and showed

12  everybody that -- they made it like -- excuse me.  The

13  government showed the exhibit to the whole courtroom as I was

14  texting during the time of the robbery.  I was having a good

15  old time.  My temperament was wasn't nothing wrong, and things

16  of this nature.

17         They provided evidence from -- of a video of pictures

18  inside of the bank on the 21st of May allegedly from my phone,

19  and obviously, it was from my phone that were being taken on

20  the 21st of May.  They showed pictures of that.

21         And their story behind that, their defense behind

22  that was this had to be him because, look, he's taking

23  pictures of different areas of this bank on the 21st of May.

24  Then they're saying I cut a hole in this roof.  All of these

25  things are done to this bank.  Allegedly, I had to have been

1   there.

2          Now, when I wrote you that letter, sir, I wanted you
3   to have that evidence, because I knew what the details of that
4   evidence of my phone would show; and what they show is I am --
5   it doesn't add up.  I am being -- you're saying I'm on the
6   roof cutting this hole in this roof on the 21st or at least
7   the 18th of May.  I am inside this bank allegedly, this is me
8   inside of this bank taking pictures of this bank.  I am in the
9   parking lot writing down people who are coming out of this
10  bank three weeks before this bank robbery.

11         These are things the prosecution showed the jury that
12  I was doing.  I did none of that.  And the evidence was in my
13  phone.  It was obvious that they didn't show the jury, of
14  course, or you, and that was my phone records show that while
15  all of this was going on on the 21st and the 18th of May --
16  they have a Google inquiry on the 28th of May of me asking my
17  phone, "How do I get to this bank?"  These things are
18  impossible to ignore.  The jury didn't hear that, your Honor.
19  You didn't hear that.

20         It seems to me like -- it seems to me that even if --
21  even as the evidence is presented, "So what?  You got caught
22  robbing a bank.  You know, whatever transpired to get you
23  there, we don't care about that."  I'm not saying you, your
24  Honor.  I'm just talking out loud because this is how the
25  government presented their case.  "So what?  You got caught,

1    and this is how it was, and you deal with it."

2         Your Honor, there was no way for me to be on this

3    roof cutting a hole in this roof.  There is no way for me to

4    be inside this bank taking pictures on the 21st of May, then

5    three days before the robbery, I'm asking, "How do you get

6    there?"

7         You are putting me in this bank, sir, in the parking

8    lot writing down notes of the people who are leaving.  You are

9    putting me on this roof cutting this hole in this roof.  You

10   are putting me inside of this bank, sir.  And then on the 28th

11   of May, I'm asking, "How do you get there?"  I'm asking what

12   their store hours are.  I would know all of that if I had been

13   in that bank.  I would know how to get there.  I would know

14   what time the store opens until the time it close if I had

15   been in the parking lot watching the people leave.

16        So, again, I say, sir, the things that I mentioned to

17   you were not mentioned to the jury, and that's not fair,

18   because the prosecution knew this.  The purpose of them going

19   in my phone was to find out information if I was really there.

20   They found that, but what they also found is that I wasn't

21   there; but they didn't present it to the jury, nor you, sir.

22        And I don't think I need to tender that to the Court,

23   but I will, because it was already -- it was in my docket, and

24   if it needs to be, then so be it.  Here it is.  This is --

25   what I'm showing is Google searches, your Honor, of the 28th

1  of May from my phone of the bank on Pulaski.

2         MR. MEYER:  Judge, this would be Defendant's

3  Exhibit 19, which is -- it's entitled, "Case Information,

4  Phone Information."

5         MR. ESTELL:  Also another thing, your Honor, that you

6  didn't know that was given to me at the last minute.  In my

7  discovery, two weeks before trial, I was given the documents

8  by attorney Mr. Mitchell that says that the agents, they --

9  they subpoenaed the cell towers to see where my cell phone was

10 being hit off of, where it was pinging off of, and they found

11 it.  They found the truth that I was not at home three days

12 before the robbery.

13        They found the truth, but they didn't present it to

14 you, your Honor, or the jury.  They found the truth that my

15 cell phone was not being used three days before the robbery.

16 They subpoenaed the cell towers.  They found this truth, sir.

17        So, as I say again, the things I'm presenting to you

18 are evidence that shows a different side.  There's always two

19 sides to a story.

20        When I was on that jury stand, your Honor, what I got

21 from my defense was, "Only say so much.  Don't go off track.

22 Don't go off trail.  Stay on course.  Say only this."

23        And truth be speaking, sir, if I had been in that

24 jury box, I would have convicted me, too.  I would have.  I

25 promise you I would have, because of what was presented, it

1    was obvious I was guilty.

2         Let me move on, sir.  Here is -- while I was in
3    prison in the MCC Chicago, I received a letter in the mail,
4    and first it was a phone call.  I don't know which one first,
5    the letter or the phone call.  There was a phone call that was
6    a threatening phone call that talked about this unknown male
7    talking about the robbery.  And you hear the robbery.  You
8    hear the tape-recording.  The jury heard the tape-recording.

9         In detail what it says is -- some of the things were,
10   "Why didn't you run out the bank when we told you?  Why didn't
11   you unplug the cameras like we told you?  Why -- what happened
12   to the gun I gave you?"  And these are -- you hear the man's
13   voice.  You hear me crying on the phone telling him, "Man, I
14   did what you told me to do.  Please leave my family alone."
15   You hear this.

16        But what it was presumed to be by the prosecution is
17   I made that up.  This man is talking about when he put me in
18   the hospital when he tried to kidnap me in 2007 or '8.  I
19   showed you proof of that.  The prosecution says I made that
20   up.

21        I show you proof of me going through everything that
22   happened.  The guy on the phone is literally talking about it,
23   the bank robbery.  The prosecution gives me -- this is the
24   thing that I really want to make a point of, sir.  The
25   prosecution gives me the rest of my discovery two weeks before

1    trial.

2           This phone call happened December of 2012.  Sir, when

3    it happened, the prosecution and the agents knew how true it

4    was because from that point, all they had to do -- I mean,

5    excuse me, they had the evidence, but they never tendered it

6    to me of everything this guy said on this phone.

7           Now, you are accusing me of making this up, making

8    this happen, which means I sat in jail, I thought of a plan,

9    and I come up with a decision to create an alibi.  Your Honor,

10   it's impossible.  I never had that evidence.  It's impossible.

11   How come nobody wants to see that?

12          The prosecution had this evidence that they gave to

13   me two weeks before the trial.  You know what it said?  That

14   there was people outside that bank watching the whole time.

15   There was a man on the roof, your Honor, on the roof of this

16   bank.  How was he helping me?  How can you tell me a bank

17   robber is on the roof helping me if I'm robbing a bank?  What

18   good is he to me on the roof of the bank?  How is he helping

19   me?

20          These things are not presented to you.  Why?

21          I never knew there was a cemetery at this bank.  I

22   never been to this area in my life.  I never knew where a

23   cemetery is.  The guy on the phone is saying, "You had us

24   stand in the cemetery for eight hours."  I never knew there

25   was are a cemetery there.

1    The prosecution gave this information to me two weeks
2  before trial, sir, and he knew there was no way for me to make
3  use of this information.

4    They also have two officers stop two different black
5  males.  The man on the phone says, "We had people posted up
6  all around that bank."  Of course everybody says I made it up.
7  How?  Never had this information.  The guy on the phone said,
8  "We had guys posted all around this bank."

9    Ironically, what did this information show that the
10  prosecution gave me, sir?  That two black males were stopped,
11  one in the cemetery, and one some blocks away that they let
12  go.

13    I'm from Chicago.  I'm familiar with Oak Lawn because
14  I know how -- what areas to stay out of because I am a black
15  man.  Oak Lawn is a predominantly white area.  There is no way
16  that you're going to be standing right there -- or there was
17  no coincidence for a man to be right there in that -- in that
18  cemetery like this guy on this phone said he was, if this was
19  a lie.

20    This was a lie.  The whole thing about this phone
21  call was vital; and the prosecution played it off like it was
22  a lie, and they shouldn't have done that.  Because the jury
23  obviously bought it because they wasn't told that the
24  prosecution never gave information, the truth to me, two weeks
25  before the trial that this was the truth.

1    You have this man saying, "Why didn't you run out of
2    this bank?"  Your Honor, if we were on the same page, why
3    would I not run out the bank?  If this guy is helping me, why
4    would I not run out of this bank and get in his car?  The
5    purpose of a robbery is to get away, not climb back on the
6    roof and hide.

7    I'm saying again, sir, these things are now -- I'm
8    going from sorry to a point of I'm angry, because things have
9    to be understood, and they're not.

10   And I thank you for giving me the opportunity to
11   explain this, your Honor, because this is possibly the biggest
12   stage of my life.  This is the biggest stage of my life.  And
13   regardless of who believes it, I cannot make this up years
14   before it happened.  This stuff does not read like this if it
15   was made up.  There was no way.

16   The guy sent me a picture of myself getting tied up
17   in my home.  The bank employees never heard this.  They sent a
18   picture of me tied up in my home.  The prosecution, the
19   government, said, "It was a lie.  You made it up.  We don't
20   know who that really is."

21   So, in order for me to have done it from jail, that
22   means, guess what, one thing had to be true:  My wife was in
23   on it, too, my fiancee.  She -- a person who's never been in
24   trouble her whole life, she helped me create an alibi, a lie.
25   Never been in trouble in her life, and now she's helping me

1   create an alibi.

2            I'm tied up in my home.  This is an exhibit.  I'm
3   pretty sure you already seen it, but what I want to tender to
4   you is the clothes that I had on.  This is the clothes that I
5   had on, the exact same picture of clothes that I had on in the
6   robbery -- I mean, in this video of me tied up in my home, the
7   exact same clothes at another date of me on my same couch that
8   the government say was a lie.  I'm being tortured, and they
9   saying it's a lie.

10           So, again, I'm pretty sure you have already saw this
11  because this was admitted into evidence at our pretrial
12  hearing, but you did not see this -- the same clothes that I
13  have on now.  You did not see this.  And the same furniture.
14  So, please allow me to enter -- tender it to the prosecution.

15           Sir, also, here is the photos of what the guy was
16  talking about on the phone, how, "We ran you off the road.  We
17  should have killed you."  This is the photos of that accident
18  that it did to me.  This is the result of what they did to me
19  when they tried to run me off the road.  And this is a graphic
20  picture, your Honor, so bear with me.  It's a graphic picture.

21           Again, I say, your Honor, this is a picture of the
22  clothes I have on and a picture of the clothes that I have on
23  when I was kidnapped and they took a picture of me in my home,
24  same jacket, same pants, the same couch.

25           MR. MEYER:  Judge, for the record, this would be

1    Defendant's Exhibit 20, which is a series of four photographs.

2            MR. ESTELL:  Another piece of evidence, your Honor,

3    was my SUV.  I was -- I was -- I had allegedly had an SUV

4    parked -- I don't know whether it was a block away, two blocks

5    away.  I'm not sure how far away it was.  But the reason I'm

6    bringing this up is because again, it goes to the common sense

7    of a robber.  Now, you don't have to be a bank robber to know

8    that bank robbers don't drive their cars to do a robbery.

9    Bank robbers get stolen cars.

10           I mean, the propaganda's all in the newspapers.  This

11   is the going rate of what people do when they robbing banks.

12   Here I am, I'm a bank robber, I'm driving down the street in

13   Oak Lawn in a brand new Cadillac Escalade and a black man with

14   $200,000 in my car that I just robbed a bank from.  I'm going

15   to get pulled over, sir.

16           But nevertheless, my point in saying this is this:

17   When they got this property -- I mean when they got my SUV,

18   wherever it's parked at, they had 33 latent prints.  Now

19   again, your Honor, this was not mentioned to you or the jury.

20   They found 33 latent prints in my SUV.  29 of them is from me

21   and my fiancee because this is our vehicle.  This is supposed

22   to be in there.  Four of them were not.

23           Now, if I drove this car to this bank site like they

24   said I did, my prints are not on the steering wheel.  My

25   prints are not on the door handle.  The door handles is

1    chrome.  The steering wheel is wood grain.  My prints on not
2    on the touch screen radio.  And this is a brand-new Escalade,
3    sir.  Everything is controlled by this digital touch screen.
4    You know where my prints are at?  On the back driver -- the
5    back passenger side door, like I was getting out of my
6    vehicle.  That's the only place my prints are on.

7         This is my car, no doubt.  My prints are not where
8    they should be.  What is it to be believed, that I put gloves
9    on to drive my own car?  Is it -- should we believe that I
10   really did have gloves on to drive my own car?  This is my
11   print.  This whole car, everything in it belongs to me.  What
12   would be the purpose of that?

13        Now, again, I'm bringing these issues to you, your
14   Honor, because this is the stuff that was never heard by the
15   jury or you.  They found four prints in my car that did not
16   match me, four of them that were on my radio, where my prints
17   should have been, my steering wheel, where my prints should
18   have been, and on the door handle somewhere else, where my
19   prints should have been the day of this robbery or however
20   long it been there.  This is not a coincidence.

21        And they found prints literally on -- my prints were
22   on the driver's side -- I'm sorry, the passenger's side back
23   door, like I was getting out, like I was being kidnapped, like
24   I said I was doing, like I said is what happened, getting out
25   of this car.  That's the only place where my prints was found.

And you've probably already seen this, your Honor, but if not, here is the exhibit -- and I'm pretty sure the prosecution has already seen this as well.

MR. MEYER: For the record, it would be three-page document already Bates stamp numbered 246 through 249 --

MR. ESTELL: Along with the Escalade, too.

MR. MEYER: -- along with a photograph of the Escalade. It would be Defendant's Exhibit No. 21.

MR. ESTELL: Last but not least sir, I've got one more thing that I want to say that was excluded from the trial that would show my innocence, along with just plain old common sense.

The agents, when they found out that the duress defense was on the table, allegedly this is what happened, of course they didn't believe it, sir. I asked them for a polygraph test. They didn't believe it. And I say, the reason why I say it again was because I did not want to go to trial. The polygraph test was for me to come to court at sentencing and show you and the prosecution what happened. That was the whole purpose of that.

There would be no other reason for me to take a polygraph test if I know I'm walking into a trap, I know I'm lying. I wouldn't have done it.

Nevertheless, my point is, the agents, when they found out about the coercion defense, they investigated only

1   my fiancee.  You know what they did?  They went and subpoenaed
2   her cell phone.  They went -- to see if she was involved in
3   helping me.

4           So, disregard the fact that she just asked you to
5   help her because people sent her a threatening letter trying
6   to kill her.  You don't investigate that.  You investigate her
7   to see if she was actually helping me with the crime, to go to
8   her job and investigate her -- her computer to see what she
9   has been seeing on this computer.

10          Needless to say, the point I'm making is this:  They
11  had -- my fiancee was part of my person to be called to
12  testify.  She was on the list to testify.  The prosecution
13  stopped that.  What should be known is this, and I'm not sure
14  if the bank employees would be able to understand this or not;
15  but my fiancee, your Honor, was a bank manager for five years,
16  five years of a major bank, five years.

17          One hand, you're telling me everything that I did in
18  that bank, I was allegedly caught because live cameras saw me
19  robbing this bank, and thank God the lady called and had me
20  arrested.  The money had stuff in it that sounded the alarm.
21  Your Honor, my fiancee is a bank manager of five years.  She
22  would know all of that.

23          The prosecution did not want me to bring it to the
24  jury or you because it makes sense.  She would not have told
25  me, "Baby, are you crazy?  You're going to go into this bank?

1    I'm telling you what's going to happen."

2         She is a bank manager of five years.  She'd know
3    everything they'd know.  Your Honor, when I went in this bank,
4    I asked the employees, "Where are the teller keys at?  Where
5    are they at?"  Do you think she would have told me that?
6    You're already saying that she isn't directly involved, which
7    means, okay, I should have talked to her.

8         Nobody is going to rob -- perfect example.  You're
9    not going to go and rob an armored car if your fiancee is a
10   driver without talking to her first, because who knows what
11   booby traps are set up on the inside?

12        Your Honor, she's a bank employee herself, a manager,
13   which means she's privy to all the information, the same
14   information that they have.  She knows the same thing.  She
15   would not have allowed that.

16        How would I -- how could I not have known that if I
17   go in this bank, I'm not going to be on a live camera, I'm not
18   going to be able to walk away with this money, if she's my
19   fiancee?  How could I not have known that?  Nobody wants to
20   understand that.  And this is the sad part.  The prosecution
21   knew this.

22        You're saying that I premeditated this whole thing,
23   sir.  I found stuff to do three weeks in advance.  I did all
24   of this stuff to premeditate this.  You're charging me of
25   premeditated bank robbery, but I'm not going to listen to the

1    one thing that's going to help me get away or the one thing

2    that's going to tell me not to do this?

3          These are things that nobody wants to talk about.

4    But as I stand before you, I'm about to be careered and lose

5    my life because they don't want to acknowledge it.

6          Yes, I was caught.  Yes, I lied, sir.  I can't take

7    that back.  But I lied because I was forced to.  I had a

8    position, lie or have my family killed.

9          So, with that being said, sir, let me say this last

10   thing.

11         If I may, I would like to address the victims, and I

12   want to ask your consent for that.

13         THE COURT:  The floor is yours.

14         MR. ESTELL:  May I turn around and address them, sir?

15         THE COURT:  The floor is yours.

16         MR. ESTELL:  I don't know how I can take back what

17   happened.  I really can't.  All I can say is I'm sorry, and

18   these are things that I wish had happened a different way.

19   People were hurt mentally.  So was I.  These people did stuff

20   to me that I would never have done to anybody else.

21         I did what I did, and I'm sorry.  But my history, as

22   I just put it before you, would not allow me to do anything

23   like this.  I am not in need of no money to rob a bank.

24         If I could take this back, I promise you, I would.

25   I had to walk -- I had to watch my child for the first time

1   walk through a prison visiting room, and it's not right.

2       What the government did is not fair to you guys, not

3   fair to me, because they had evidence of a lot of people

4   involved, and they hid that.  I'm not supposed to be the only

5   one standing here.  I'm supposed to be people -- I'm supposed

6   to be testifying at their trial for what they did to me.

7       They didn't allow that, because they had me in

8   custody, and that's all they wanted me to do.  They had a

9   conviction.  Okay.  Turn it over.  Leave it alone.  And that's

10  not fair because the best interests of justice is to make sure

11  that you guys get everybody that's involved, not just me.

12      I never wanted to go through the trial and take

13  nobody through this to show on the screen the bank robbery in

14  process.  I didn't want that.  But I was left no choice.  I

15  wasn't given a plea bargain.  I wasn't given an opportunity to

16  say, "Your Honor, can I have some leniency for not going to

17  trial?"  I wasn't given that opportunity.

18      My fiancee does the same thing you guys do.  She

19  knows everything that you guys know, my fiancee knows it.  If

20  this was something that I wanted to do, to get away with a

21  bank robbery, all I had to do was ask her.  She's been one for

22  the last 10 years.  All I had to do is ask her.  It doesn't

23  make sense.

24      So, with that being said, I'm deeply, deeply sorry

25  for what happened.  I lied to the authorities, and I shouldn't

1  have.  And to both you agents, I apologize to you as well.  I
2  lied to you guys, but I saw no other choice.  I really didn't.
3  If I could change it again to you guys to make you guys
4  believe me some kind of way, I would have done that, but I saw
5  no other choice.  I lied, and I can't change that.  I lied
6  because I thought my family's life was more important than a
7  lie.

8      Mr. Wentz, you're the first person I met.  When I met
9  you, I couldn't hold my head up.  I told you I was
10  embarrassed.  Bank robbers are not embarrassed.  Bank robbers
11  are not embarrassed.  Bank robbers are violent people that do
12  violent things.  They're not embarrassed.  It just doesn't
13  happen like that.

14      When I tied those victims up, the first thing I told
15  them was, "Ma'am, I'm not going to put tape in your hair,"
16  because I did not want them to pull it out and have their hair
17  come out with it.  This is me -- this is me not being a bank
18  robber.  This is not me being a bank robber saying, "I don't
19  give an A about what's going on, and I'm coming in to hurt
20  you."  This is not what that's for.  Bank robbers do not care
21  about a person's hair.  I'm a violent man coming in to hurt
22  you.  What do I care about pulling your hair out for?

23      I'm a man of God.  I'm sorry.  This is not what I do.
24  So, to the families, I'm sorry.

25      Your Honor, I'm just going to say, I want to leave it

1    to my fiancee.  I'm pretty sure she has something she'd like
2    to say.
3           THE COURT:  Okay.  Thank you, Mr. Estell.  You'd like
4    to present Miss Randle to make a statement to the Court?
5           MR. ESTELL:  Yes.
6           THE COURT:  You can have a seat, Mr. Estell.
7           Good afternoon, Ms. Randle.
8           MS. RANDLE:  Good afternoon, your Honor.  How are
9    you?  I'm sorry.  I'm a little choked up right now.
10          My name is Tinka Randle, and I've been with
11   Mr. Estell for roughly 10 years.  And I just wanted to come
12   before the Court and just pretty much give you guys a
13   different insight into who he really is.
14          And when everything took place, I was very confused.
15   I didn't understand.  This was a family man who took primary
16   care of our son, who's now two, with drop-offs and bathing him
17   and making sure he was taken care of while I was at work
18   because of the hectic schedule that I currently have.  So, I
19   didn't understand why it happened, why he did it, and I was
20   very angry, until things started to unravel.
21          So, before, your Honor, my stance was how can a
22   person who's so family-oriented, who has encouraged me not
23   only to participate in things like CeaseFire, but he was
24   always with me with Father Pfleger, how can you just turn,
25   jump ship like that?  I absolutely didn't understand it.  Most

1    importantly, I don't understand how he just gave up our
2    family.

3           When we had a conversation when he first arrived at
4    the MCC, one of the very first things he asked me was, "Are
5    you okay? Are you okay?" That was the subject, "Are you
6    okay?" And later on, things started to come out.

7           Now, he's never been a one to just outright tell me,
8    "Well, this is what's going on. This is what happened in the
9    past, and this is why." He's never been that type of person.
10   But as he started to unleash or unravel the story about what
11   took place in the past -- and again, we've been together for
12   almost 10 years -- it started to make sense to me.

13          Your Honor, again, I'm just here today just to kind
14   of vouch for him being a family man, him being in our son's
15   life, who at the time was six months and now he's two years
16   old, who's literally had to -- I have to take him to visits so
17   he can see his son, and how he still knows who he is.

18          So, I wanted to see -- I wanted the Court to see him
19   in a different light. And Lord knows that this is not in his
20   character. This is -- I was totally confused as to why he
21   even made that decision until, again, things started to come
22   out, things started to happen to me that I didn't understand,
23   me having to go over to my mother's house, me having -- being
24   afraid. Me being with my son and seeing, you know, cars
25   just -- the accident I had, being ran off the road.

1       I did not understand it.  I didn't even want to deal
2   with it.  All I knew to do was to call the police and reach
3   out to family, who are here with me today.
4       So, your Honor, I don't know how this is going to
5   end, but I'm asking you to take into consideration that he is
6   truly indeed a family man.  And things have been unbearable
7   for me in terms of daycare expenses, housing.  It has been
8   very hard for me because he was the primary -- he took care of
9   his family.  He took care of his family.  He was a protector.
10  He made sure things were okay.  And now I'm a single mom who
11  has to -- may have to tell her son that daddy's gone forever.
12      So, Judge, I'm asking that you take into account
13  these things.  And he's not a monster.  He's not a monster.
14  I've always known him to be that protector, that provider for
15  us.
16      And I saw this man in a different light when our
17  first son was born.  Everything was about him.  So, the fact
18  that he overnight changed into this, quote, unquote,
19  "monster," look, your Honor, I don't understand.  It doesn't
20  make sense.  It does not make sense at all.
21      One day, we're out at the museum together, and the
22  next day, I'm getting a phone call while I'm at work.  He's
23  asking me am I okay and to go over to my mother's house.  It
24  does not make sense at all.
25      Thank you.

1      THE COURT:  Thank you, Ms. Randle.

2      MR. MEYER:  And, Judge, I think Miss Randle's father

3  also wanted to speak on behalf of Mr. Estell.

4      THE COURT:  Okay.

5      MR. RANDLE:  How you doing, Judge?

6      THE COURT:  Good afternoon.  What's your name?

7      MR. RANDLE:  My name is Freddy Randle.

8      THE COURT:  Freddy Randle?

9      MR. RANDLE:  Yes.  I'm Tinka's father.  I'm also a

10  minister, and I served 20 years in the service.  I'm pretty

11  sure everybody in here has had a daughter, and their daughter

12  always wants somebody similar to what their father is.  And

13  what I saw in Charles is he was a provider for his family.

14      I never saw my daughter want for anything.  I always

15  saw her happy.  I didn't see nowhere where he abused her.

16  Whatever she wanted, she got, and she talked highly about him.

17  I was happy.  I was happy that she found somebody that was

18  there for her.  And that's what fathers want.

19      But I also know that my daughter's life was in

20  danger.  I'm very reserved.  Like I said, I spent 20 years in

21  the service, and I noticed -- I noticed -- I noticed -- I

22  don't know what's wrong with the mic, but I noticed when I was

23  driving in the car with her, I would see cars zip in and zip

24  out.

25      I never did -- I've never been to see Charles in

1    jail.  All I know is I'm going to protect my daughter.  I only

2    got three of them, and one's dead.  And I'm going to protect

3    my daughters.

4           And I know from somewhere -- someone was following my

5    daughter.  I know that for a fact, because I had me and two of

6    my army buddies surveillance my daughter, and I saw what

7    people was following her.  This, I know for a fact.

8           I don't know Charles.  He has not coached me this.  I

9    have never, ever been to any of -- to see him.  This is my

10    first time speaking on his behalf.

11           But the most important person that I'm here for is my

12    grandson.  My grandson misses his dad.  I have to take up that

13    slack.  He really misses his daddy.  And if I could pull this

14    up and let you see, Judge, he's an awesome young man.  He's

15    going to be somebody.  He's already singing praises to God.

16    He's a happy young man, and he misses his dad.

17           And I'm pretty sure, as I heard Charles say, bank

18    robbers are bank robbers.  They don't have a heart.  And I

19    believe that -- in my heart, I truly believe it, and I'm going

20    to say this for real, that somewhere, someone made -- put

21    Charles up to this.  I really believe that, your Honor.

22           And I want to show you this picture as soon as my

23    phone come up.

24           But I know this is his sentencing, but if you could

25    find it in your heart to somewhere, somewhere let him do what

1   he needs to do, but get back to my grandson and my daughter.

2   Because now I have to fill that need.  I have to fill in that

3   void.  I'm not going to let them go without.

4          But when you're sentencing him, you're taking a whole

5   lot from my daughter.  I've watched her go through it.  I've

6   been there.  Every time she comes from seeing him inside the

7   joint or the fed joint, I watch the change in her.  I've

8   watched every day since he's been locked up what she goes

9   through.  I can't do nothing but pray, I can't.

10         Everybody deserves a second chance, your Honor.  Some

11  people do things -- I've even done things in my past, but that

12  God upstairs changed me.  He can change anybody.  So, I'm just

13  asking the Court, whatever the Court decide, that you don't

14  lock him up for life.

15         If you'll give me one minute, your Honor.

16         THE COURT:  That's okay, Mr. Randle.  And I believe I

17  have a picture here of your grandson.

18         MR. RANDLE:  This is him right here, your Honor.

19  This is him, your Honor.  You just might have to hit it again.

20  He's in my bed.  I'm watching him for my daughter, who's going

21  to court to see Charles.  That's my grandson.  That's -- he's

22  going to miss his dad.

23         Thank you.

24         THE COURT:  Okay.  I've seen your phone, and I saw

25  the picture on the phone.

1          MR. RANDLE:  Thank you.

2          THE COURT:  Anything else, Mr. Randle?

3          MR. RANDLE:  No, your Honor.  Thank you very much for

4   hearing me out.

5          THE COURT:  Thank you.

6          Mr. Estell, do you have anybody else who will be

7   speaking on your behalf?

8          MR. ESTELL:  No, no, your Honor.

9          THE COURT:  All right.  Why don't we -- we've been

10  going for about an hour and 10 minutes.  Let's take a very

11  quick five-minute break.  I'll be back in five minutes.

12         Mr. King, you can collect your thoughts, and we'll

13  start off with you.  If you'd like to present

14  Miss Heisterman --

15         MR. KING:  I think Miss Heisterman -- would

16  Miss Heisterman go first, your Honor?

17         THE COURT:  That's fine.  Anybody else you'd like to

18  have address the Court, you may have that person address the

19  Court, and then I'll hear from you.  I'll be back in five

20  minutes.

21    (Recess had.)

22         THE COURT:  Okay.  We're back in session.

23         Mr. King.

24         MR. KING:  Your Honor, I think this would be a good

25  moment to have Miss Marypat Heisterman address the Court.

1    THE COURT:  All right.

2    MS. HEISTERMAN:  Good afternoon.

3    THE COURT:  Good afternoon.

4    MS. HEISTERMAN:  I'd like to thank you for allowing

5    me to speak today.

6    First and foremost, I'd also like to thank the

7    Assistant U.S. Attorneys and the FBI, who in conjunction with

8    the Oak Lawn Police Department and the South Suburban

9    Emergency Response Team worked countless hours investigating

10   the events that took place on July 2nd, 2012, and securing a

11   guilty verdict.

12   Next, I'd like to thank all of my co-workers and

13   protective service managers at Bank of America for all of

14   their help, support, and guidance over these last past months.

15   Most of all, I'd like to thank Xochiil for her

16   bravely during the robbery and every day since.  I lay awake

17   at night thinking about what could have happened had we both

18   not remained strong together that day.  For that, I'll be

19   forever grateful.

20   Xochiil could not bring herself to come today.  She

21   could not bear to face him again.  She could not bear to tell

22   her story again.  So, it's my turn to be brave for the both of

23   us.

24   Never in a million years would I have dreamed that

25   what happened on June 2nd, 2012, could happen to me.  What

1  started out as a normal day as I conducted a simple audit on a
2  coworker before she went on vacation turned into my worst
3  nightmare.
4           He dropped out of the ceiling.  He pointed a gun
5  directly at my face.  He shoved me to the ground.  He tied my
6  hands with zip ties.  He duct-taped my wrists multiple times,
7  and then he made my coworker open the vault.  He then
8  duct-taped her hands behind her back.
9           Thoughts ran through my head as I lay there waiting
10 for him to leave.  I wanted to hold Xochiil's hand so she knew
11 we were in this together.  I wanted to pray out loud so we
12 could pray together, but feared any repercussions.
13          I've heard people say when you die your life flashes
14 before your eyes.  What I've never heard is what happens when
15 you think you're going to die.  What flashed before my eyes
16 was the life I was going to miss, my husband, my kids, their
17 college graduations, the life I was going -- their future
18 weddings, and my future grandchildren.
19          I laid on the floor terrified to move because I
20 thought he was going to kill us.  He then duct-taped our
21 ankles and our mouths, and at that moment, I thought for sure
22 he was going to shoot and kill us.
23          Mercifully, he left us, but before he did, he told us
24 to wait 10 minutes before we tried anything.
25          As I was being held hostage, the Oak Lawn Police sent

1  out a massive phone call to all residents alerting them to the

2  fact that there was an armed gunman in the area.  As the word

3  spread throughout the community, my family received word that

4  I was one of the ones in the bank.  My sister, who lived with

5  my mother just blocks from the bank, had the awful task of

6  telling my mother that I was one being held hostage.  My

7  80-year-old mother who was at the time courageously battling

8  lung cancer now had to sit in fear knowing that her daughter

9  was the one being held at gunpoint.

10       Once we were safe, I learned that Xochiil had

11  enough -- was brave enough to look up at times and try and

12  gather details about him.  While grateful that she was able to

13  recall the details, I still feel tremendous guilt that she had

14  the presence of mind to try to get the details as I lay there

15  too scared to move.  She was in the same situation, the same

16  danger as me, but she overcame her fear.

17       The guilt does not end there.  After the trial ended,

18  I found out that he had planned this robbery down to the point

19  of identifying who drove what type of car.  He staked out our

20  parking lot.  How did I not notice him before?  By not

21  noticing, did I put the lives of my staff in danger?

22       Every day, I have to live with those questions and

23  that guilt.  If I see a car sitting in the parking lot for too

24  long, I get worried that something like that will happen

25  again.

1    I now have to seek treatment from a therapist.  I've

2    been diagnosed with post-traumatic stress disorder.  I try

3    hard to overcome my feelings of guilt and nightmares, but the

4    littlest occurrences have triggered panic attacks.

5        I'm afraid to be alone in my own home.  I no longer

6    like going to crowded places.  I'm always afraid something

7    will happen there.  The littlest things scare me.  A small

8    noise will make me jump.

9        One day, my husband walked into a room where I was

10   watching TV and asked me why I was crying.  I didn't even

11   realize I had been crying.  I was watching a TV show where a

12   girl had been kidnapped and duct-taped around her mouth,

13   ankles, and wrists.

14       I remember watching a particular show in which the

15   criminal went to a store to buy supplies to commit his crime.

16   I then realized that he also had to have done this.  He went

17   to a store and bought the duct tape and some ties he used to

18   tie us up.

19       Seeing a person in dreadlocks and beads immediately

20   triggers a panic attack.

21       Shortly after the robbery, one of my children had

22   surgery.  While waiting in the surgical room, a woman with

23   dreadlocks and beads was sitting nearby.  I suffered a panic

24   attack just looking at her.  The poor woman had done nothing

25   to me.  She was just waiting there for her loved one, like me,

1    to come out of surgery.  The sight of her hair was enough to
2    trigger a panic attack.

3         I've chosen to not move forward with the surgery
4    recommended by my doctor because of fear of having my mouth
5    taped during the surgery.

6         I've never suffered from panic attacks prior to the
7    robbery, but they are reel, and unfortunately have become a
8    part of my everyday life.  I still cannot stand the sight of
9    duct tape.

10        Recently, my husband cut his hand requiring stitches.
11   When he went to go take a shower later that day, he needed to
12   have his hand wrapped in plastic to cover his injury.  The
13   only tape he could find was duct tape.  He needed help to
14   secure a bag over his hand so he could shower.  I could not
15   and would not put the duct tape around his wrist.  The very
16   thought of doing that sickened me.

17        There are many times that I swear I can still feel
18   the tape on my wrist, and I start rubbing them to get the
19   adhesive off.

20        I've heard of the expression frozen with fear, but I
21   have never actually known how true that phrase is.  There have
22   been many occasions where I have been frozen with fear since
23   the robbery.  If I hear a noise in the middle of the night, I
24   literally cannot move because I'm so scared.  This has also
25   happened at work, where I've heard noises and I just freeze.

1        I have not slept through the night since the robbery.
2    I take two sleeping pills at night and still cannot sleep
3    through the night.  The recurring nightmare of him holding the
4    gun sideways at my face, saying, "I told you to wait
5    10 minutes before you try anything," has never stopped.
6        My life has changed.  My view of the world has
7    changed.  No longer am I a trusting person.  I don't look at
8    people the same anymore.  There are days I don't know if I can
9    bring myself to walk through the doors of the bank.
10       I hate to admit this, because I don't want him to
11   win.  There are days while I'm at work that I cannot -- I feel
12   I cannot focus because fear of another robbery invades my
13   thoughts.  Not a day has passed since June 2nd, 2012, that I
14   have not thought about the robbery, and I thank God every day
15   that I am alive.  My worst fear is that he will get out of
16   jail and terrorize someone else or, worse, kill someone.  I
17   hope and pray that he never gets that chance.
18       Thank you.
19       THE COURT:  Thank you, Miss Heisterman.
20       Mr. King, anybody else?
21       MR. KING:  No, your Honor.
22       THE COURT:  Okay.  You can now address the 3553(a)
23   factors.
24       MR. KING:  Your Honor, first of all, I think to make
25   sure that the record is clear, I'd like to present to the

1 │ Court the state -- we have the State of California records and
2 │ those two additional ones, which we'll mark, that were
3 │ examined by defendant.

4 │        THE COURT:  You know what, I've seen -- are those the
5 │ ones I've already seen?

6 │        MR. KING:  No, your Honor.  They're the actual
7 │ certified court records.  They should probably be in the court
8 │ record, which is why I'd like to make that as a sentencing
9 │ exhibit.

10 │        THE COURT:  I'll take a look at them, and then I'm
11 │ going to hand them back to you for you to mark; and then we'll
12 │ get copies to Mr. Estell and to the Court, and you can work
13 │ with Jackie on that.

14 │        MR. KING:  Yes, your Honor.  Can I do this all at
15 │ once?

16 │        THE COURT:  Sure.

17 │        MR. KING:  And then I also have the certified court
18 │ record of the vehicular hijacking/kidnapping case.  So, it's
19 │ the certified court record, as opposed to just the half sheets
20 │ and unofficial records that you have so that the record is
21 │ complete.

22 │        THE COURT:  Okay.

23 │        MR. KING:  I have -- would reoffer for purposes of
24 │ the sentencing hearing Government Exhibit 4, which is, just so
25 │ the record is complete, the video of the robbery.  And I would

1    ask leave of Court to include in the sentencing record the

2    affidavit of net worth from the defendant which was given to

3    the Probation Department.  I cannot do that without you --

4    your court order, but that would be an exhibit as well.

5          THE COURT:  Okay.  Any objection to the affidavit of

6    net worth being submitted to the Court?

7          MR. ESTELL:  No, your Honor.

8          THE COURT:  Okay.  I'll order that the affidavit is

9    allowed to be submitted.

10          MR. KING:  Your Honor, I'll try and be brief.  In the

11    face of all the evidence, the defendant clings to this version

12    of reality that he purports to you.  Time does not allow us to

13    address each and every one of the half truths, partial truths,

14    little bits of reality that he set forth to you; but I think

15    if we wanted to touch on one or two, the lies regarding the

16    clothes, the clothes that he provided you with a number of

17    pictures and the clothes that he was wearing.  As you recall

18    from the testimony at the trial, the kidnappers gave him a new

19    set of clothes.

20          There was a lot of time spent castigating the prior

21    attorneys.  I don't think this is the proper forum for that,

22    but we take issue with the representations there.

23          With respect to the -- whether or not the attorneys

24    properly advised him regarding a plea or no plea, I think

25    that's probably best dealt with at a different forum; but

1   let's suffice it to say the defendant did not enter a plea of

2   guilty, and the defendant did not agree to the essential facts

3   of the gun charge.  As you recall, he -- he professed his

4   belief that it was a toy gun and kept that version.  So, the

5   notion that he would plead guilty to using a weapon during a

6   bank robbery or that he possessed the gun, those are steps

7   that he was not willing to take.

8          With respect to the litany of the reasons he wouldn't

9   commit the crime, the vast assets, he submitted before you a

10  LexisNexis printout and a bond on the vehicular kidnapping.

11  With respect to the bond on that, a $400,000 bond is what's

12  referred on the half sheet, of which he had to post

13  10 percent, which was approximately $40,000.  And the bond

14  sheet that he presented to you reflects that Leonard Goodman

15  withdrew from the case and was given leave to withdraw and was

16  replaced by yet another attorney, Todd Urban.

17         So, I'm not sure that that really takes him anywhere.

18  But it's completely at odds, the position that he has a half a

19  million dollars, with the representations that he made to

20  Pretrial Services, which is that, "I am unemployed.  I don't

21  have a job.  The last job I had was a barber for about $500 a

22  week."

23         The statements to Probation and the affidavit of

24  financial services, I am reasonably confident that he would

25  not have qualified for the Federal Defender were he possessing

1   a half a million dollars in assets.

2         At trial, he testified basically that he was an

3   itinerant barber going from home to home cutting hair, and he

4   had cash in his closet, and that's the reason he did it.

5   Today, he was a commodities trader.  Commodities trader seems

6   a little odd, because felons -- it would seem almost

7   impossible to be licensed as commodity traders with a felony

8   conviction, as the defendant did at the period of time that he

9   claimed to be a commodities trader.

10        When he makes the representations as to his assets,

11  despite what LexisNexis might have entered, he shows no

12  assets, no physical assets.  He doesn't even own the cars.

13  So, we have at least that statement made to a court officer

14  versus his representation today to you.

15        I think when we look at the basic theme of what this

16  is is, "It's not my fault.  It's everybody else's fault.  When

17  I pled guilty to a 10-year sentence in the carjacking case,

18  that wasn't my fault.  That was my bad attorney's fault."

19        At various stages of his life, it's always a bad

20  attorney who gave him advice; and of course, when the robbery

21  came, that wasn't his fault, because somebody else made him do

22  that, too.

23        It's an age-old story for people that can't come to

24  grips with who they truly are.  It's always somebody else's

25  point.  And maybe when it's always somebody else's fault,

1    maybe it really is you.

2         He professes that this is not his character, but if

3    you look at what's in the record, the letter from Althea

4    Beaird, the woman who going through chemotherapy, the

5    defendant still managed to coax $12,000 from her, and she

6    wrote this Court asking to see if you could help her get that

7    money back.

8         You can see from his testimony and what he has done

9    and the facts of the case, he's adept at manipulation.  And

10   there isn't any ability for this individual to stop lying.  He

11   lies so often, he lies to himself.  He can't even remember

12   what lies he's told.  And the individual representations here

13   are so fraught with half truths that it's hard to take them

14   seriously.

15        But I think when you're trying to decide where this

16   case goes, when referring to Government Trial Exhibit No. 4,

17   the video of the bank robbery, the composite video, what it

18   does do is it corroborates everything that Marypat Heisterman

19   said to you.  And it also puts a lie to pretty much everything

20   the defendant said, both at trial and here.

21        You can see a complete lack of coercion.  For not a

22   violent man, you can see a man who seems thoroughly

23   comfortable with handling the weapon, putting a weapon to the

24   victim's head, picking it up, putting it down, constantly

25   handling it.  No clumsiness.  He's calm, and he spends an

1    inordinate amount of time going through there.

2            When you look, what is truly troubling about
3    that video is the unnecessary restraint he used with
4    Miss Heisterman.  I mean, he kept repeatedly coming back to
5    her, first after zip-tying her.  Then he duct-tapes her.  Then
6    he takes some money.  Then he comes back and duct-tapes her
7    again.  Then he comes back, takes more money, duct-tapes her
8    again.

9            There's a creepy, dangerous, scary element of the
10   amount of attention that he was paying to those victims.  It
11   is beyond that which would normally be expected for a man who
12   was in a Kafkaesque, placed into this circumstance beyond his
13   control, and he was just doing the best to make do of this.

14           He used an enormous amount of deliberation.  If you
15   recall from the video, when he first restrained the victims,
16   he got the zip ties out of the backpack.  He knew the zip ties
17   were in there.  He got those out.  And when he wasn't
18   confident the zip ties would be enough, he started with the
19   duct tape.

20           Contrary to his comments, that video best describes,
21   when you looked at Xochiil Martinez at the end when she's
22   trying to use her feet to dial 9-1-1, and when she looks at
23   the camera, she's so terrified.  It is such -- it explains
24   that this kind of crime is different from a lot of the crimes
25   that come before us at federal court.

1       Most of the crimes that come before us are the kinds
2   of cases in which large corporations or large institutions are
3   victimized, or you never really see real people or really feel
4   that there are real consequences.  And in this case, there are
5   real victims, and the victims extend beyond the bank.

6       What is very, very troubling here is that when you
7   consider the 3553 factors, and the circumstances of the
8   offense are pretty much encapsulated by what you saw and what
9   you heard of the bank robbery.  But the rest of the factors,
10  the history of the defendant, the characteristics of him, the
11  protection of the public, all of those things come together
12  with when you look at a bank robbery, there's a spectrum.  You
13  have the people who are out of a job down on their luck.  They
14  walk into a bank not knowing what they're doing.  They pass a
15  note.

16      This defendant is at the opposite end of that
17  spectrum.  It's a man who hid in the roof for hours, and then
18  after taking the money hid in the roof for almost 12 hours
19  trying to elude capture.

20      It's a man who did research, as the computer records
21  show.  He handed you an exhibit from his phone which showed,
22  as he felt showing the address, and that seemed completely out
23  of sorts.  But if you notice two entries down, it's a search
24  for LeFebure, which is the vault manufacturer.  There's
25  nothing inconsistent with that, but it does show the degree of

1 planning that he had.

2 What is really troubling here is the defendant's

3 history. You know, he was released from the Missouri cocaine

4 charge in December 29th of 2003, and within six months, he's

5 in trouble again. In June 1 of 2004, he's got that theft

6 problem from the car dealership in Tinley Park, albeit only

7 for gas cards. It ended up being a misdemeanor, but it shows

8 that he hasn't got -- he hasn't followed the program.

9 Rehabilitation hasn't really worked for him.

10 About a year later is when the hijacking, attempted

11 kidnapping takes place. When he's released from that, about

12 two years later in April of '07, that's when the possession of

13 the stolen motor vehicle crime occurs. He has a stolen car

14 out of a Hinsdale car dealership, the Range Rover that he was

15 driving.

16 About a year after that in October of 2008, he has

17 that little marijuana problem in San Diego.

18 He is released from the vehicle hijacking charge, and

19 16 months, approximately, after being released onto parole,

20 but not probation, that's when he goes and commits this bank

21 robbery.

22 And what he told the FBI and what he -- at the time

23 was, "I am not working. I don't have any job. My girlfriend

24 is the sole support. I'm embarrassed about that. I need the

25 money." That makes perfect sense.

1    But 16 months afterwards, if you look at his history,
2    there's no confidence that anyone can have that this is not
3    the type of person who will go out and commit this offense
4    again.  He doesn't seem to learn from probation.  He's
5    violated probation.  He's violated parole.  He's violated
6    supervised release.  It isn't working for him.

7    And there's a small subset of society for whom a
8    first mistake is it.  "I'm not going to do that anymore.  Boy,
9    that was bad.  I don't know what I was thinking."  They go
10   off, and they don't do this again.

11   This defendant is different.  He's at the other end
12   of the spectrum.  Just like the bank robber who uses a gun
13   instead of a note, just as a bank robber who uses extensive
14   planning instead of spur of the moment, he's at the other end.
15   He's incorrigible.  He's a recidivist.  He's a person who
16   can't seem to help himself.

17   And that really comes back down to that whole notion
18   of it's all about him.  It's all about what he wants and when
19   he wants it.

20   He's a violent and dangerous individual.  The fact
21   that he wouldn't have any hesitation in using that weapon,
22   the fact that he could lie repeatedly about the motive for
23   this, and the notion that, "It's not my fault," speaks deeply
24   to his character.  When it's always somebody else's fault,
25   what it means is that there's no self-recognition that there

1 | is right and wrong, or if there is, those rules apply to me.
2 | And in that sense, he's a very, very dangerous individual.

3 | For all of these reasons, I suggest that a sentence
4 | in touch with the Guideline structure is appropriate in this
5 | case and certainly called for. I think with respect to
6 | Count 1, the bank robbery, the defendant should be sentenced
7 | at the upper end of the statutory maximum sentence of
8 | 25 years, perhaps not 25, but certainly very close to it.

9 | And with respect to the weapons offense, I'd suggest
10 | at the lower end of that sentence. That sentencing structure
11 | range is seven to life. I'd suggest seven years consecutive
12 | to the sentence imposed in the bank robbery case is
13 | appropriate not just for the protection of society and
14 | appropriate for the nature -- to not deprecate the
15 | circumstances of this crime and to give fair warning to those
16 | who are willing to plan and do this and others that are
17 | similarly situated, and all the factors under 3553, I think
18 | that's an appropriate sentence, and I'd ask that you impose
19 | that.

20 | With -- in addition, I'd ask that the order of
21 | forfeiture which we've previously entered, the preliminary
22 | order, be entered when publication is complete, but it at
23 | least be noted on the J & C, the statutory costs. And to the
24 | extent -- and to the full period of supervised release.

25 | And I would ask that to the extent that the defendant

1    does have assets, as he seems to believe he does, for that
2    reason alone, we should probably impose a fine of
3    approximately $100,000.
4            Thank you, your Honor.
5            THE COURT:  Thank you, Mr. King.
6            Probation?
7            MS. KWONG:  Nothing on behalf of Probation, your
8    Honor.
9            THE COURT:  One thing I'd like to ask you about is in
10   the -- in paragraphs 118 and 119, Probation addresses
11   Mr. Estell's financial condition and his ability to pay a
12   fine.  And the PSR says that a query of the Nexis --
13   LexisNexis Accurate revealed no real estate property or motor
14   vehicles registered to or owned by the defendant.
15           And Mr. Estell, perhaps contrary to his interests
16   with respect to the fine, is arguing that he does have a lot
17   of property, and he handed me the LexisNexis report.
18           I'm wondering, is he wrong about the report, or is
19   the PSR wrong about the report?
20           MS. KWONG:  I have not seen Mr. Estell's report.
21   When I did the query, there wasn't anything.  And it was based
22   on a Social Security Number, Mr. Estell's reported Social
23   Security Number.  Personally, I don't have that LexisNexis
24   Accurate report printed and in the file at this time.
25           THE COURT:  Did you -- were you able to take a look

1    at the LexisNexis report that Mr. Estell gave to me?

2            MS. KWONG:  I did not see it, your Honor.

3            THE COURT:  Would you like to take a look at it now?

4            MS. KWONG:  Sure.

5            The only thing I can comment on with this is with

6    respect to the vehicle, since the registration expiration

7    dates were prior to my submission of the report, it's

8    generally not counted as an asset owned by a defendant.

9            With respect to the properties, if I had seen these

10   on my report when I did a query of the property identification

11   numbers, it may have come up, but there is a different owner.

12           THE COURT:  And who's the owner?

13           MS. KWONG:  I can't -- I don't know at this time.  I

14   don't have my LexisNexis report.

15           THE COURT:  Who does that -- what does that sheet

16   reflect as the owner?

17           MS. KWONG:  This has -- this probably --

18           THE COURT:  There's two other names down at the

19   bottom of the first page.

20           MS. KWONG:  I don't know -- do you remember -- are

21   these the names that you're referring to?

22           THE COURT:  Yes.  Who are they?

23           MS. KWONG:  These are Anette Estell and Anette Adams

24   Estell, and it references others using the Social Security

25   Number that's provided on this report, which let me check my

1  records to see if that's -- which is the same Social Security
2  Number that Mr. Estell provided me as his Social Security
3  Number.

4           THE COURT:  Okay.  What do you make of that?

5           MS. KWONG:  I don't know what to make of this, your
6  Honor.  Again, what my understanding is, LexisNexis is based
7  on whatever's public records; and then in terms of verifying
8  beyond that, I don't have a lot of resources to do that.

9           THE COURT:  Right.  So, your LexisNexis printout was
10  different from that one, correct?

11          MS. KWONG:  Again, I don't have my report with me, so
12  I can't say for sure.  However, if I saw these properties on
13  the report that I ran for Mr. Estell, I would have checked the
14  property identification numbers; and if it indicated that
15  there is a more recent owner other than Mr. Estell, I would
16  not have attributed these properties to Mr. Estell.

17          THE COURT:  I see.  So, is what you're saying that
18  this report may reflect properties that Mr. Estell owned in
19  the past?

20          MS. KWONG:  Correct.

21          THE COURT:  And doesn't currently own?

22          MS. KWONG:  Correct.  It could be a possibility.

23          THE COURT:  So, what you're saying is that if you saw
24  those properties or those cars -- or those properties and you
25  put in the number into the -- whatever database you use --

1           MS. KWONG:  It's another query that's part of

2    LexisNexis.

3           THE COURT:  Okay.  And it showed somebody else owning

4    the property, then you would not -- you would conclude that

5    what this report is showing is a property that Mr. Estell

6    previously owned but does not currently own?

7           MS. KWONG:  Correct.

8           THE COURT:  All right.  Thank you.

9           MS. KWONG:  Thank you.

10          THE COURT:  Mr. Estell, if you'd like to say anything

11   in reply to what Mr. King presented or really any -- if you'd

12   like to say anything in reply to anything that has been

13   presented to the Court after you concluded your presentation

14   or I guess after Miss Randle concluded her presentation, you

15   can do so now.

16          MR. ESTELL:  Your Honor, may I sit here?  Because

17   from my accident, my leg's bothering me.

18          THE COURT:  That's fine.

19          MR. ESTELL:  I have rods in my leg, and I have a

20   brace on my pelvis.  My pelvis is broken because of the

21   accident.

22          THE COURT:  That's fine.

23          MR. ESTELL:  So, it's hard for me to stand up.

24          Yes, I definitely would like to address the Court.

25   First in regards to what the PSR --

1     THE COURT:  If you could pull the microphone up just
2     a little bit.  Thank you.

3     MR. ESTELL:  First, I would like to address the Court
4     as far as the PSR inquiry.  Your Honor, some of those
5     properties I do not own as of right now.  They were sold.
6     Like my restaurant, it was sold.

7     So, yes, I thought I said that to you when I brought
8     it to your attention.  Some of those properties I either own
9     or had owned.  Not all of the properties I own.  Only three of
10    them right now I own.  But the restaurant, in reference to
11    that, as you can see, there are three owners applied to that
12    name, and a couple of more pieces of property.  So, those
13    properties were something that I was a part of because I was
14    doing real estate.

15    As far as the -- hopefully I answered the question.
16    I don't know.  But there is no -- there is no way for me to
17    say that those properties are gone -- I mean, what I'm trying
18    to say is I'm not saying that those properties are not mine.
19    Some of those properties are; some of them are not.  That's
20    all I'm saying in reference to that.

21    Also, on the prosecution, your Honor, it's very rare
22    that I have an opportunity to explain myself.  Never have I
23    had an opportunity to explain myself in any court proceeding
24    I've done, any, be it a state crime or federal crime, so when
25    I accepted responsibility, I accepted that wholly.

1    There was -- that was the reason why I purposely
2  tried to get every attorney that I had, every last one, to
3  plead guilty is because I was guilty.  I mean, I had three
4  attorneys; and all three attorneys, I tried to get them to
5  help me plead guilty, and it didn't happen.

6    That wasn't me trying to lie.  That wasn't me trying
7  to put the weight off on someone else, as the State's Attorney
8  claims.  That was me saying, "I'm guilty.  Can you please help
9  me plead guilty?"

10    That was the purpose of me writing you the letter
11  because nothing else was working.  And I thought by me writing
12  to you and getting you involved, maybe you would inquire
13  about, "Has Mr. Estell had an opportunity to plead guilty?"
14  That was my purpose.

15    So, if you're judging me off of what I've done or as
16  the prosecution has said, I'm always blaming someone else,
17  that wasn't my intention, even with the carjacking case.  I
18  said to you while we were standing there, I took part in that
19  conviction because I blamed myself because I shouldn't have
20  had the opportunity to help someone who I knew wasn't right.

21    The guy who I gave my van to, he had just come home
22  for murder, and I knew in the back of my mind that he was --
23  wasn't going to do the right thing.  But I helped him anyway
24  because that's the type of person I am.  I help people.  I
25  wanted to believe that he was different.  But I gave him my

1  van, and he went and did something crazy with it, and I was
2  charged for it.

3        So, not one time did I say, "You know what, I'm upset
4  because I'm being ill-treated."  All I was saying was, "I'm
5  wrong because I have not -- shouldn't have been associated
6  with that.  I accept that responsibility."

7        Even in this case right now, sir, I accept
8  responsibility.  But what I wanted was to give you the
9  opportunity to judge me based off the fact that I pleaded
10 guilty.

11       And despite what everybody seems to think, you know,
12 I'm not a bad person.  I'm not a -- I have lied to the police.
13 I did that, and I can't -- I can't reference that enough why I
14 lied.  I can't, because it's just nothing -- at this -- at
15 this stage, nothing is good enough to explain why I lied.

16       But nevertheless, I'm not going to go off of what I
17 said that didn't happen to me, because it did.  Now, if I can
18 turn that back, could I have tried something different to get
19 away or tried to alert the authorities a different way?
20 Probably.  I probably could have.  You know, but in hindsight,
21 when a person is in a situation like that, you never know what
22 you're going to do when you're just faced with that kind of
23 situation.

24       Your Honor, I took off my clothes on that stand right
25 there and showed you what they did to me.  And I know a lot of

1    things I cannot explain that sound terrible.  I know that.  I

2    felt it when it happened.  There was things I couldn't

3    explain.  There was things that made people say, "Yeah, you're

4    guilty."

5         But overall, the things that I showed you, my fiancee

6    being a bank employee, the things that I would have known had

7    I -- if this was what I was going to do, it would not have

8    happened like that.

9         You know, and I'm terribly sorry to the Court.  I'm

10   terribly sorry, sir, but I do not want to lose my life because

11   of what I've done.  I am 40 years old, sir, and a 20-year

12   sentence or 30-year sentence is a life sentence for me.

13        And I would like the opportunity to have the ability

14   to see my son graduate.  That's it.

15        THE COURT:  Okay.  Thank you, Mr. Estell.

16        Anything from anybody else at this point?

17        MR. KING:  No, your Honor.

18        THE COURT:  Okay.  I'm going to step back for about

19   10 minutes, collect my thoughts, go over my notes, and I'll

20   come back out and announce the sentence.

21    (Recess had.)

22        THE CLERK:  12 CR 416, USA versus Estell.

23        THE COURT:  Good afternoon.

24        MR. KING:  Good afternoon, your Honor.

25        THE COURT:  Everybody can be seated if they would

1  like.

2  I'm sorry. Mr. Estell. I neglected -- you did
3  present your own case, and I neglected to ask you if you would
4  like the opportunity for allocution. Every criminal defendant
5  before sentencing has a right to address the Court, and I was
6  thinking because you had been addressing the Court for much of
7  the day that you might not have anything else to say; but I
8  want to give you this formal opportunity to present what is
9  called allocution, if there's anything that you'd like to say
10 that you haven't already said.

11 MR. ESTELL: Yes. Of course, I thought about this.
12 This kind of -- it's crazy that you say that, your Honor,
13 because while I was back there in the bullpen, all of these
14 things that I wanted to say that was extra. But to address
15 this Court, I can't -- if I can address this Court all day, I
16 would say the same thing over and over and over and over
17 again. And it would be I'm sorry.

18 I really wanted to address the victim of not only the
19 bank, but my family, because they are victims as well. I
20 cannot -- I cannot change what's about to happen. I just hope
21 that all the evidence that I presented to you that you wasn't
22 aware of helps you make a better decision. Because what was
23 presented to you is what happened at trial, but what I
24 presented to you here today were some things that you were not
25 aware of. And I just hope that makes a -- helps you make a

1  decision to help me.

2         And I wanted to plead guilty, your Honor.  I tried
3  to plead guilty.  I had no -- I had no sense of how it would
4  turn out, whether it would be the same sentence now or not.
5  My thing was just to plead guilty to the courts and to the
6  victims to say I was sorry for what I had done.

7         And can the Court sentence me based on the fact that
8  I'm saying this is what I did, but as a mitigating factor,
9  this is what I was going through.  This is why I was humbly
10 trying to plead guilty.

11        All three of those attorneys, as I put it in front of
12 you, even if at this point everything I have been saying is to
13 be believed to be a lie, everything -- the proof I've showed
14 you, your Honor, is documentations of what my intentions were.

15        And I've been in jail almost two years, two years for
16 this crime, and I probably don't know what the sentence --
17 obviously, I don't know what the sentence is going to be.  But
18 my family is victims as well.

19        And however the -- however tall the lie seemed when
20 I was testifying or even the evidence presented to the jury,
21 it wasn't.  Nobody in this room comes from where I've come
22 from.

23        And with that being said, I'm not saying that you
24 owe -- nobody owes apology for being raised like I was raised.
25 Nobody owes anybody an apology.  Because if I had an

1   opportunity to be raised in a better environment, I probably

2   would have had an opportunity.  I would have been afforded

3   that.  But crime is so bad in my neighborhood.  It's terrible.

4   That's all I'm saying.  Your Honor, it's terrible.

5           I had my fiancee pull up a crime history of the

6   statistics of 2012 when this happened to me, and there were

7   over 400 people kidnapped that year.  400 people is a lot of

8   people, sir.  There were over 400 people -- and actually, I

9   have the statistics in front of me.  There were over 400

10  people kidnapped that year, and -- yes.  I'm sorry, 363 people

11  kidnapped in 2012.  Robbery, 18,000 robberies in 2012 in the

12  City of Chicago.

13          300 people is more than this room probably can fit,

14  and this is what's going on just in a certain part of Chicago,

15  not Illinois.  We're talking about Chicago.  The majority of

16  those people are in my neighborhood, sir, so it's highly

17  likely that these things can happen.  And that's all I'm

18  saying.

19          And again, I say, your Honor, I'm sorry.  I didn't

20  want to drag this out in court, but when I was first going

21  through the proceedings, my attorneys were telling me, "Don't

22  open your mouth.  Let this proceedings go how they're going to

23  go, and whatever the judge gonna do, he's gonna do."

24          And I was listening to that.  That's why I never

25  raised my hand to say, "Sir, I want to plead guilty," or blurt

1   it out in front of the Court, because I did not want to upset
2   you.

3          I'm not trying to deceive anybody.  Everything I
4   presented to you is evidence.  I'm tendering it to the Court
5   because I want it to be reviewed as evidence.  I am in no
6   position to lie to a federal judge at this stage in my life.
7   I am in no position to lie to a federal judge who has my fate
8   in my hands.

9          I begged the prosecutors and the agents for a lie
10   detector test.  I begged them, sir.  And the only reason why I
11   begged them is because I knew one day I was going to have to
12   be judged by you.  So, with that being said, just please, give
13   me the opportunity to have -- see my son graduate eighth
14   grade.

15          Thank you.

16          THE COURT:  Thank you, Mr. Estell.

17          There are two parts to a sentencing proceeding in
18   federal court.  The first part is to determine the Advisory
19   Guidelines range, and the second part is to apply the 3553(a)
20   factors, one of which is the Advisory Guidelines range.

21          We've already determined the Guidelines range, and it
22   was determined to be 360 months to life.  It's advisory, not
23   mandatory, so the Court has to consider those 3553(a) factors
24   in determining what the appropriate sentence is going to be.

25          There's a -- on Count 1, of which Mr. Estell was

1    convicted, the bank robbery count, there's a 25-year maximum

2    sentence.  On Count 2, there's a seven-year minimum sentence

3    and a maximum sentence of life.  And the sentence on Count 2

4    has to be consecutive to the sentence on Count 1.  So, the

5    statutory range that the Court has is -- for both Counts 1 and

6    2 is seven years to life.  So, with that -- and the Advisory

7    Guidelines range is 360 months to life.

8         So, with that, the Court will turn to the 3553(a)

9    factors.

10        Subsection (a)(1) requires the Court to consider the

11   nature and circumstances of the offense and the history and

12   characteristics of the defendant.  The offenses themselves are

13   very serious.  We have armed bank robbery, Count 1, under

14   Section 2113(a).  Count 2, under Section 924(c), the use of a

15   firearm during and in relation to a crime of violence.  And

16   the crimes were an armed bank robbery at the Bank of America

17   in Oak Lawn on June 2nd, 2012.

18        The evidence presented at trial demonstrated to the

19   Court for purposes of sentencing that this was a meticulously

20   planned crime.  Mr. Estell cased the bank for weeks before the

21   robbery.  This was proven beyond any conceivable doubt by the

22   evidence.

23        Mr. Estell's BlackBerry had photos of the vault room

24   from -- dated well before he says that he had been kidnapped.

25   He Googled the Bank of America branch.  He Googled the

1    LeFebure bank vault.  He -- there was handwritten descriptions
2    of the employees and their cars and their arrival times.  He
3    cut a hole in the roof to give him access to the space above
4    the vault room.

5         On the day of the robbery, he drove to about a block
6    away, block or two away from the bank.  He parked.  He had a
7    disguise consisting of a mask and a wig, black clothes, a
8    Glock pistol with an extended magazine holding about 20 live
9    rounds.  He had zip ties, duct tape, a flashlight, water, and
10   two fully-charged cell phones.

11        This is somebody who was very, very prepared.  He
12   dropped in the ceiling -- from the ceiling after hours.  He
13   didn't shoot anybody, fortunately; but the episode was
14   extremely violent and extremely terrifying for the two
15   employees he encountered, Miss Heisterman and Miss Martinez.

16        He pointed a loaded Glock at them, including at
17   Miss Heisterman's face.  He shoved one of them to the floor.
18   He tied them up.  He bound their ankles.  He bound their
19   wrists.  He put duct tape over their mouths.

20        Miss Heisterman addressed the Court today.  She was
21   severely traumatized and remains so to this day.  We didn't
22   hear from Miss Martinez today, but I did -- I do remember
23   quite vividly her testimony here in court at the trial in
24   September, and she was very visibly and obviously traumatized
25   as well.

1    Then there was an hours-long standoff after the bank
2   robbery.

3    And Mr. King is right.  I don't -- as you know from
4   the trial, from the pretrial, and from even the sentencing, I
5   do not agree with everything Mr. King says, far from it.  But
6   I do agree with him on this, that this bank robbery was of a
7   higher order than any bank robbery I've seen in my
8   three-and-a-half years here.  It was an extremely detailed
9   level of planning.

10    And most bank robbers wouldn't have been capable of
11   doing what Mr. Estell did.  Mr. Estell is highly intelligent.
12   He is quick-witted.  And I have no doubt, not just by a
13   preponderance of the evidence, but by the highest burden of
14   proof, beyond a reasonable doubt, I have no doubt that he was
15   capable of planning and executing a scheme of this complexity.

16    This was not a spur-of-the-moment decision on his
17   part.  It was planned far in advance.  And then after the
18   fact, he obstructed the investigation.  He told three sets of
19   stories, each with varying degrees of untruthfulness.

20    The first story was that he robbed the bank because
21   he needed money; and that, actually, I think, is what was the
22   closest to the truth.  But in the course of telling that story
23   to the investigators for the FBI, he said he threw the
24   backpack with the money and the gun off the roof.  That turned
25   out not to be true.  Those items were found on the roof in an

air vent.

He said he arrived at the bank that day by bus and planned to flee by getting a ride from two other people. That's not true. He drove himself in his Escalade.

And he also said it was partially an inside job, that a female employee provided him with the bank hours and the details of the operation, and that he was to keep $10,000. That also was not true.

A couple of weeks later, Mr. Estell changed his story and spun a tale about two people named Rick and Jennifer who had put him up to it.

And then about six months later, he concocted his current story, which I said was audacious, and I believe that -- I wholeheartedly believe that it was audacious. He said he had been abducted before the robbery and that the abductors forced him to commit the robbery against his will by threatening to kill him and Ms. Randle and their child.

There were so many holes in that story that were revealed at trial, and I'll just mention a couple. And this is not by any stretch intended to fully catalogue everything that was wrong with that story.

Mr. Estell said that he was beaten up by his abductors, yet the photos of him when he entered the MCC a couple of days later and the examination that was conducted of him showed no bruises, no scrapes.

1    There were the pictures of the vault room on his
2  BlackBerry that were taken at least a week, I believe,
3  before -- before the robbery, certainly well before the time
4  that he was -- he was allegedly abducted.  How did those
5  photos get on his BlackBerry?  There was no explanation from
6  Mr. Estell.

7    There's only one possible explanation, which is that
8  Mr. Estell was casing the bank beforehand and he took the
9  pictures himself, showing that this was well-planned-out,
10 showing that he did not, as he now claims, commit the robbery
11 because he had been abducted.

12   He Googled the Oak Lawn branch of Bank of America.
13 He Googled the LeFebure vault, information about the LeFebure
14 vault days before the alleged abduction.

15   He had detailed notes about the various employees,
16 their cars, and their work hours.

17   That, and the other -- those items and the other
18 evidence presented at trial convinced the Court that there is
19 absolutely no truth to Mr. Estell's claim that he committed
20 this robbery under duress because he had been abducted and put
21 up to it -- the robbery by his abductors.

22   Making matters worse, he tried to -- he enlisted
23 Miss Randle and an unknown male to try and falsely corroborate
24 the abduction story in two phone calls that were made to the
25 MCC after he had been there several months, and the letter.

1   And he's adhered to that falsehood to the present day.

2           The story is outlandishly false.  It is perjury.

3   Mr. Estell, I believe you committed perjury at trial, and I

4   believe that you continued to commit perjury -- although you

5   weren't sworn, I believe that you are lying to a federal

6   judge.  You lied to the jury.  You're lying to me now.

7           The one thing I agree with you is you said that if

8   you had been on the jury, you would have found yourself

9   guilty.  I concur with that.

10          Mr. Estell -- I also have to consider the history and

11  characteristics of the defendant, and Mr. Estell did have a

12  tough childhood.  There was excessive alcohol consumption in

13  the home.  He suffered from economic depravation.  He had an

14  absent father.  I'm considering those factors, and I take

15  those factors into account in evaluating what a proper

16  sentence will be.

17          I also acknowledge, and I am giving full

18  consideration to the fact that Mr. Estell has a fiancee,

19  Miss Randle, who presented herself in court today.  I'm also

20  considering that they together have a child, a son, who's

21  about two years old.  I have a picture in the exhibits that

22  Mr. Estell presented, and I saw the picture on Mr. Randle's

23  phone.

24          I have no doubt that Mr. Estell cares for Miss Randle

25  and their son, and I have no doubt that they care for him back

1    and love him back.  And I believe Mr. Randle when he says that

2    Mr. Estell has been a provider and a family man for

3    Miss Randle and their son, and the Court understands the fact

4    that a sentence -- a lengthy sentence will impose a toll on

5    Mr. Estell's fiancee, their son, and others, other members of

6    his family.  I'm considering that, and that consideration will

7    be reflected in the sentence.

8          The Court received letters in Mr. Estell's -- to

9    support Mr. Estell.  I read all of those letters, and I'm

10   going to acknowledge them.  I received a letter from

11   Mrs. Murphy, who I believe is Mr. Estell's grandmother.  I've

12   received letters and read them from Bernea Cleaves and Diane

13   Cleaves, and there was also a petition signed by 30 people

14   that I read as well, and I'm considering those as well.

15         While on the subject of Mr. Estell's family, I want

16   to thank Miss Randle and Mr. Randle for their presentation --

17   for being here today and for their remarks to the Court.  I

18   also want to thank Miss Heisterman for being here today and

19   addressing the Court and giving her views as well.

20         And I know that there are others in the courtroom who

21   have either not -- have not written letters or did not address

22   the Court today, but I want to acknowledge your presence and

23   thank you for being here.

24         I also want to thank the probation officer.  I forgot

25   to thank the probation officer, who had to leave, for her

1  comprehensive report.  I want to thank counsel for the
2  government.  And, Mr. Meyer, thank you for being standby
3  counsel for Mr. Estell in these proceedings.

4         Also as part of the nature -- I'm sorry, the history
5  and characteristics of the defendant, I have to consider
6  Mr. Estell's history of criminal conduct.  It's extensive.
7  It's 14 criminal history points.  He's a career offender.
8  There's the conspiracy to distribute crack cocaine, theft,
9  stolen vehicle, vehicular hijacking.

10        Mr. Estell attempted to excuse his vehicular
11 hijacking.  I did not find him credible, and I do not believe
12 his story that he told here at sentencing.

13        And Mr. Estell says that he accepted responsibility,
14 and I found under Section 3E1.1 that he wasn't entitled to
15 acceptance points under the Guideline.  And I also -- even
16 colloquially, the Court does not believe that Mr. Estell has
17 accepted responsibility.  He has adhered to his wholly
18 implausible story of being abducted and forced to commit the
19 robbery.  That's not accepting responsibility.  Accepting
20 responsibility is saying, "I planned this.  I did this.  It
21 was my fault."  It's not blaming others.

22        And Mr. Estell said here today that he wanted to
23 plead guilty but was not allowed to.  I don't -- I can't
24 pretend to know and I don't know what happened between
25 Mr. Estell and his counsel.  And this may be something that he

1  will want to raise in a 2255 petition, as well as the fact

2  that all the evidence that Mr. Estell believes ought to have

3  been presented at trial was not presented.  That's also

4  something that Mr. Estell can raise in a 2255 petition.

5          The one thing I do recall is that we were scheduled

6  to start trial on a Monday, and we ended up postponing the

7  trial for two days.  And it was my thought that after the

8  BlackBerry materials had come to light, that Mr. Estell was

9  going to plead guilty; but we showed up on Wednesday morning,

10  and Mr. Meyer informed the Court that Mr. Estell wanted to

11  proceed to trial.

12          That's on the record.  My recall may be imperfect;

13  but whatever happened happened, and it's captured on the

14  record.  And the Court of Appeals can see what happened on the

15  record with respect to the decision to go to trial as opposed

16  to the decision to plead guilty, at least with respect to what

17  happened immediately before trial.

18          Subsection (a)(2) requires the Court to consider the

19  need for the sentence imposed to reflect the various

20  purposes -- to accomplish the various purposes of criminal

21  punishment.  The first is to reflect the seriousness of the

22  offense, to promote respect for the law, and to provide just

23  punishment for the offense.  The Court's already addressed the

24  seriousness of the offense, and I won't belabor that point.

25          The sentence must also afford adequate deterrence to

1  criminal conduct.  That is general deterrence, and the
2  sentence does have to send the message to those contemplating
3  committing armed bank robbery that it ought not to be done and
4  that there's a heavy price to be paid, and the final sentence
5  will reflect that consideration as well.

6        The third purpose is to protect the public from
7  further crimes of the defendant, and that has to do with
8  specific deterrence, deterring Mr. Estell from committing
9  further crimes, and incapacitation, which means keeping him
10 separate from society so he is incapable of committing more
11 crimes.  And that's a substantial concern here.

12       I understand Mr. Estell is -- you said you're
13 40 years old.  You may be 39.  You may be 40.  And as a
14 general rule, the recidivism risk decreases as people get
15 older.  But I -- I'm concerned that that -- that this is not
16 the case with Mr. Estell, and I do not believe that it is the
17 case with Mr. Estell.

18       The prior lengthy sentences that he's served,
19 including for a federal drug offense and vehicular hijacking,
20 did not deter him.  Mr. Estell has committed crimes while on
21 supervised release and on parole from earlier crimes.  And
22 he's a dangerous man.

23       Mr. Estell, I believe you're a dangerous man.  You're
24 capable of violence.  The video showed that.  And what's most
25 troubling is that you haven't accepted responsibility for your

1    actions.  And because you haven't accepted responsibility, you
2    haven't reflected on what you've done and made a commitment to
3    take a better course in life.

4         So, no judge has a crystal ball.  I certainly don't.
5    But based upon what we have seen from your record and what we
6    saw at trial and what we saw here today at the sentencing
7    hearing, I think it's likely -- you are likelier than almost
8    any defendant I've seen to return to a life of crime upon
9    release, if, in fact, you are released when you're physically
10   capable of committing more crimes.  And I believe it's
11   necessary to incapacitate you for a significant period of time
12   to protect the public from you.

13        Subsection (a)(3) requires the Court to consider the
14   kinds of sentences available.  I've already mentioned what the
15   ranges are for Counts 1 and Count 2.  The Advisory Guidelines
16   range is 360 months to life.  It's advisory, but it's
17   something that I have to consider.

18        I want to mention, Mr. Estell made an argument --
19   made an argument that I construed, I believe correctly, to be
20   an argument that even if he were found to technically be a
21   career offender under the Guidelines, that that overrepresents
22   his criminal history.  I don't believe that is the case.  I do
23   believe that Mr. Estell is a career offender technically under
24   the Guidelines and colloquially as the term career offender --
25   that you are a career offender colloquially as well, that you

1    have made a career of committing crimes, violent crimes.  And

2    the last one is the worst crime you've committed.  And so I

3    don't believe that the career offender status overrepresents

4    your criminal history.

5           Subsection (a)(5) requires the Court to consider any

6    Guideline policy statements.  Mr. Estell, in your brief, you

7    mentioned one, which is 5K2.12, coercion and duress.  I don't

8    believe that applies because I don't believe your story of

9    coercion and duress.

10          Subsection (a)(6) requires the Court to consider the

11   need to avoid unwarranted sentence disparities among

12   defendants with similar records who have been found guilty of

13   similar conduct.  There's been no -- no substantial argument

14   made on that.

15          And subsection (a)(7) requires the Court to provide

16   restitution to any victims of the offense, and I don't believe

17   that any has been requested by the government or by the PSR.

18          So, the Court has considered everything that was

19   presented.  I sat through the trial, paid close attention.

20   I've read all the materials that have been submitted by

21   Mr. Estell and by the government and by the Probation Office.

22          I've reviewed all of the exhibits that have been

23   presented here today.  I've taken into account the arguments

24   that have been presented by both sides and the statements of

25   Mr. Randle and Miss Randle and Miss Heisterman.

1    And it's the Court's duty to impose a sentence that
2  is sufficient but no more than necessary to fulfill the
3  purposes of 3553(a).  And the term of incarceration that the
4  Court is going to impose on Mr. Estell is 300 months on the
5  bank robbery, 90 months on the 924(c), served consecutively,
6  for a total of 390 months.

7    That's at the lower end of the Guidelines range.  I
8  believe a Guideline sentence, and this sentence in particular,
9  is appropriate and no more than necessary to fulfill the
10  purposes of 3553(a), given the nature of the crime, the way it
11  was carried out, Mr. Estell's efforts to avoid responsibility
12  not just for this crime but for the vehicular hijacking, his
13  criminal history, and the need to protect the public from
14  Mr. Estell.

15    Seventh Circuit precedent requires the Court to
16  consider whether in imposing a term of years the Court is
17  imposing a de facto life sentence.  The Court thinks it's
18  unlikely that this will be a de facto life sentence for
19  Mr. Estell.  That said, the Court acknowledges that there is
20  a risk that it will be, and the Court has fully considered
21  that risk and finds that it is justified in light of the
22  extreme danger that Mr. Estell poses to society.

23    It's the Court's obligation to impose a $200 special
24  assessment.  There's no restitution.  With respect to a fine,
25  I'm going to take the Probation Office -- Mr. Estell was

1  arguing that he has assets, which would reflect an ability to

2  pay the fine.  I don't believe Mr. Estell, and that's to his

3  benefit in this instance.  I'm not going to impose a fine on

4  Mr. Estell.  And any assets that Mr. Estell does have,

5  Miss Randle and their son are going to suffer the consequences

6  of Mr. Estell's incarceration, so any assets that Mr. Estell

7  has and Miss Randle has I would like to remain with

8  Miss Randle and for her benefit and for the benefit of their

9  son.

10          The Court's going to impose a term of supervised

11  release of five years on each count to run concurrently.  Five

12  years, it's important, because when Mr. Estell gets out -- and

13  I hope he does get out -- he's going to need the supervision

14  of the Probation Office to make sure he stays on the straight

15  and narrow.

16          The terms of supervised release are follows:

17          Within 72 hours of release from the custody of the

18  Bureau of Prisons Mr. Estell shall report in person to the

19  Probation Office in the district to which he's released.

20          While on supervised release, Mr. Estell shall not

21  commit another federal, state, or local crime.  He shall

22  comply with the standard conditions that have been adopted by

23  this court.

24          He shall refrain from any unlawful use of a

25  controlled substance.  He shall submit to one drug test within

1   15 days of release from imprisonment and random drug tests

2   therefore conducted by the Probation Office, not to exceed

3   104 tests per year.

4         He shall cooperate were the collection of a DNA

5   sample at the direction of the probation officer.

6         He shall not possess a firearm or destructive device.

7         If Mr. Estell is unemployed after the first 60 days

8   of supervision or if unemployed for 60 days after termination

9   or layoff from employment, he shall perform at least 20 hours

10  of community service per week at the direct of and in the

11  discretion of the Probation Office until gainfully employed.

12        And Mr. Estell shall provide the probation officer

13  with access to any requested financial information.

14        Mr. Estell, would you like the Court to recommend a

15  place of incarceration for you?

16        MR. ESTELL:  Yes.  My brother is in Greenville,

17  Illinois.  Is that possible?

18        THE COURT:  In Greenville, Illinois?

19        MR. ESTELL:  Yes, sir.

20        THE COURT:  Is that a federal facility?

21        MR. ESTELL:  Yes, sir.

22        THE COURT:  Any objection to that recommendation?

23        MR. KING:  No, I have no objection.

24        THE COURT:  Okay.  I'll make that recommendation,

25  Mr. Estell.  The Bureau of Prisons does not have to accept the

1    Court's recommendation, but I'm going to make the

2    recommendation for what it's worth.

3             MR. MEYER:  Oh, and, Judge, on that point, could the

4    J & C reflect that the defendant's brother, his name is James

5    Estell, and his registered number is 42238-424.

6             THE COURT:  That's James Estell, 42238-424.

7             MR. MEYER:  Correct.

8             THE COURT:  Okay.  I will make that recommendation.

9             There's going to be a final -- a motion for entry of

10   a final forfeiture order, is that correct?

11            MR. KING:  That's correct, your Honor.

12            THE COURT:  And that has not yet been filed?

13            MR. KING:  No.  Publication is not completed yet.

14            THE COURT:  Okay.

15            Mr. Estell, you have 14 days to appeal your

16   conviction and your sentence, and that 14 days runs from the

17   date that the judgment and commitment order is entered on the

18   docket.

19            Is there anything else that we need to address?

20            MR. KING:  Your Honor, the forfeiture is entered as

21   to the defendant.  The publication is really for any third

22   parties, so I think the forfeiture at least gets included in

23   the J & C.

24            THE COURT:  Right.

25            MR. KING:  No, your Honor.

1        THE COURT:  I've already entered a preliminary order

2   of forfeiture, is that correct?

3        MR. KING:  I know, but for some reason, it has to be

4   on the J & C.

5        THE COURT:  Okay.  We'll include it on the J & C as

6   to the defendant.  And that's just the gun, is that correct?

7        MR. KING:  That's correct.

8        THE COURT:  All right.

9        MR. MEYER:  And, Judge --

10        MR. KING:  And the bullets.  It's the gun and the

11   bullets.

12        MR. MEYER:  And, Judge, I told Mr. Estell that I

13   would file a notice of appeal on his behalf within the 14-day

14   period.  Also, I will order the transcript of the trial and

15   the sentencing hearing and any other hearings if the Court

16   would otherwise the production of the transcripts.

17        THE COURT:  And no objection?

18        MR. KING:  No objection.

19        THE COURT:  Yeah, of course, I will authorize the

20   production of the transcripts.

21        Mr. Meyer, thank you -- I know you're just standby

22   counsel, but thank you for facilitating the notice of appeal.

23   Mr. Estell's appeal rights ought to be preserved.

24        MR. MEYER:  They will be.

25        THE COURT:  And he ought to have all the materials

1    that he needs in order to prosecute the appeal to the best of

2    his ability.

3            MR. MEYER:  And, Judge, on that -- I think -- what --

4    I think the Court of Appeals will normally appoint an attorney

5    to represent Mr. Estell, and I think that is his wish, to be

6    represented by counsel on appeal.

7            THE COURT:  Okay.  And that is -- once I -- once I

8    impose the sentence and the appeal gets taken, it then becomes

9    up to the -- it's up to the Court of Appeals at that point to

10   appoint counsel.

11           MR. MEYER:  Exactly.

12           THE COURT:  And that's how you believe it will

13   proceed?

14           MR. MEYER:  I do, Judge.

15           MR. KING:  Yes, your Honor, I do.

16           THE COURT:  Okay.  So, that will be up to the Court

17   of Appeals.  I imagine that the Court of Appeals will appoint

18   counsel for you, Mr. Estell.

19           Now, these -- these exhibits, have they been

20   numbered?

21           MR. KING:  They haven't, your Honor, but what we've

22   discussed is that we'll make color copies of the exhibits, and

23   then Mr. Meyer and I will label them and deliver them to your

24   clerk tomorrow.

25           THE COURT:  Okay.  And let's make sure Mr. Estell

1    gets a copy and you get a copy and we get a copy.

2           MR. KING:  Yes, your Honor.

3           THE COURT:  Okay?

4           MR. MEYER:  And, Judge, I think if I'm correct, the

5    originals that Mr. Estell offered today should be returned to

6    him, and then we'll provide the Court with copies of those

7    exhibits.

8           THE COURT:  You can make -- that's fine with me.  You

9    can make whatever arrangements for that you'd like to make.

10          MR. KING:  And there may be a gap in the numbering

11   system, but we'll do it just the way it is so it matches the

12   transcripts.

13          THE COURT:  Right.  Okay.  Is there anything else --

14          MR. KING:  No, your Honor.

15          THE COURT:  -- that we need to address?

16          MR. MEYER:  No, Judge.

17     (Which were all the proceedings heard.)

18                           CERTIFICATE

19     I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above-entitled matter.

21

22   */s/Charles R. Zandi*                  *August 18, 2014*

23   _____          _____
     Charles R. Zandi             Date
     Official Court Reporter

24

25